## Commonwealth *v.* Johnson, Appellant.

| 162 | 63 |
| 31 SC | ²314 |

| 162 | 63 |
| 217 | ² 80 |

| 162 | 63 |
| f218 | ¹438 |

| 162 | 63 |
| 227 | ²114 |

*Criminal law—Murder—Evidence.*

On the trial of an indictment for murder the uncontradicted evidence was to the effect that the prisoner was an idle, shiftless man, working only at irregular intervals, and with no other home than a stable where he slept, getting his meals where he could.   He had separated from his wife, and refused to contribute to her support and that of his child, a little girl four years old.   The wife being unable to support the child left it with the prisoner at the livery stable, but against his consent.   The prisoner's mother took charge of the child for a while, but subsequently sent it back to the prisoner with a small basket of child's clothes.   During the day on which the child was returned to him, the prisoner made several ineffectual attempts to have some one take charge of it.   In the evening he borrowed a horse and buggy for the purpose, as he said, of taking the child home. He took the child with him and drove away, leaving at the stable the basket of clothes.   In less than an hour he returned in the buggy alone.   The next morning the child's hat was found on the bank of the river, about a mile from the town, and about one and a half miles from the stable.   The point where it was picked up was in a path which led down to the river where there was no underbrush.   Here the water formed an eddy or pool, and was about ten feet in depth.   The distance from the hat to the water was about twenty-two feet, and a public road led from this point to the town.   Six days afterwards the body of the child was found in the water six hundred and seventeen feet from where the hat was picked up.   There was no mark of violence upon the body, and death had apparently resulted from drowning.   On the morning after the child had been taken from the stable, the prisoner made several inconsistent and improbable statements as to what he had done with the child.   *Held,* that the evidence was sufficient to sustain a conviction of murder in the first degree.

*Criminal law—Confession—Evidence—Review.*

To exclude a voluntary confession of guilt, some inducement must be held out to prompt to falsehood, and of this the trial court must be the judge in the first instance, and its rulings will be set aside only for manifest error.

*Declarations—Falsehoods—Evidence.*

Voluntary declarations made by a person indicted for murder, to ordinary witnesses after his arrest, which are shown to be falsehoods, are proper evidence for the commonwealth, as tending to establish guilt.

Argued May 10, 1894.   Appeal, No. 498, Jan. T., 1894, by defendant, Henry Johnson, from judgment of O. & T. Lehigh Co., on verdict for Commonwealth.   Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ.   Affirmed.

Indictment for murder.

The facts appear by the opinion of the Supreme Court.

*Errors assigned* were as follows:

1. The court erred in admitting the testimony of Howard F. Kramer, relating to statements made by the defendant to him, after the said Kramer, coroner and committing magistrate, had said to him, " If you produce your child, I will let you go free ; if not, I must hold you—must hold you as a witness."

2. The court erred in admitting the testimony of Kramer, the coroner, as to the statements made by the defendant, whilst he was in legal custody and under the pressure of persuasion or threats, and whilst the defendant was in the hands of the chief of police, who had taken him to the coroner.

3. The court erred in admitting the testimony of Henry S. Smith, relating to statements made by the defendant to him, after the defendant had the aforesaid conversation with the coroner, and after he was imprisoned in the county jail by order of the said coroner.

4. The court erred in admitting the testimony of George F. Zimmerman, relating to statements made by the defendant to him, after the defendant had the conversation with the coroner, and after he was imprisoned by order of the coroner.

5. The court erred in admitting the testimony of Tilghman H. Deshler, relating to statements made by the defendant to Henry S. Smith in the witness's hearing, after the conversation of the defendant with the coroner, and after the defendant was imprisoned by the order of the coroner.

6. The verdict of the jury is illogical from the testimony, as it bases an inference upon an inference.

7. The finding of the fact of the corpus delicti by the jury was inferential, as there was no mark of violence on the body of the child, and as the proof was that the child might have been in the water not less than three nor more than eight days, and as the body was not found until six days after the child was last seen with the defendant, and because the presumption in cases of drowning, without any other evidence, is always in favor of accident or suicide and for the innocence and not the guilt of the defendant.

8. The guilt of the defendant must have been inferential in

the minds of the jury, because the corpus delicti was inferential, and because the testimony showed that the defendant was no nearer than a mile from the place where the drowning occurred, and because there was no other evidence of the defendant's guilt except statements made by him of his disposition of his child and its whereabouts (which statements were improperly admitted), and from which testimony as to the corpus delicti and the statements, the jury must have arrived at the defendant's guilt, thus basing an inference upon an inference.

9. The court erred in admitting the testimony of John W. Sepp, against the objection of the defendant, as to complaint made by Irene Johnson against Harry Johnson on October 3, 1890, for desertion and for the nonsupport of herself and her child.

*A. G. Dewalt*, for appellant, cited: State v. Grant, 22 Maine, 171; Com. v. Morey, 1 Gray, 461; Spears v. Ohio, 2 Ohio, N. S. 583; Fife v. Com., 29 Pa. 429; Thompson's Case, 1 Leach's Cr. Cas. 325; Com. v. Harman, 4 Pa. 269; State v. Cowan, 7 Ired. 239; Boyd v. State, 2 Humph. R. 37; Greenleaf on Evidence, Redfield's edition, sec. 220; Rex v. Cooper, 5 C. & P. 525; Rex v. Meynell, 2 Lewin, C. C. 122; Roscoe's Criminal Evidence, 7th ed. 46, 47, 48; Regina v. Wheeley, 8 Carr. & P. 250; Rex v. Lewis, 6 Carr. & Payne, 161; Com. v. Curtis, 97 Mass. 578; Com. v. Taylor, 5 Cush. 610; Com. v. Tuckerman, 10 Gray, 193; Com. v. Knapp, 9 Pickering, 495; Williams v. Com., 29 Pa. 105; Com. v. Harman, 4 Pa. 270; Com. v. Johnson, 24 Pa. 386.

*James L. Schaadt*, district attorney, *C. A. Groman* with him, for appellee.

OPINION BY MR. JUSTICE DEAN, May 23, 1894:

In this case, the defendant averring poverty, a hearing on his appeal was granted without printed paper-books. However, the whole of the testimony, and the charge of the court, are sent up with the record, and as the gravity of the accusation and its consequences to the appellant demanded a careful consideration, we have critically examined this voluminous record with the assignments of error before us to determine if any one of them ought to be sustained.

The defendant is a young man; about five years before the

trial, he had been married to one Irene Weaver; one child, a
daughter, Bertha Johnson, was born to them; about two years
after this they separated, the mother keeping the child with her;
finding it burdensome to maintain the child and herself by her
labor, she persistently demanded contribution from the father
for its support; he finally, on legal proceedings being insti-
tuted, agreed to pay a small sum weekly for this purpose; this
payment he kept up for about ten weeks and then stopped.
The mother again became importunate in her demands upon
him for the child's support; these being unheeded, she, against
his consent, left it with him at a livery stable in Allentown
where he was working; he then took it to his mother, Susan
Frank, and asked her to care for it. She, on the ground of
poverty and ill health, refused, but consented to keep it tem-
porarily. Johnson then procured for it some clothes; at the
end of four weeks his mother sent the child back to him at the
livery stable, with the declaration that she would keep it no long-
er; this was on the morning of the 25th of July, 1893. The
child was then about four years old; when taken back, John-
son's mother had sent with it a small basket of child's clothes.

Bertha remained at the stable all day; the father, during the
day, had made several ineffectual attempts to have some one
take charge of it; he had no home other than the stable where
he slept, getting his meals where he could, and sometimes hav-
ing them brought to him; he seems to have been shiftless, work-
ing only at irregular intervals for uncertain wages. In the
evening of that day, about eight o'clock, he borrowed a horse
and buggy from his employer, for the purpose, as he said, of
taking the child home; he took Bertha in the buggy with him
and drove away, leaving at the stable the basket of clothes; in
less than an hour he returned in the buggy alone. The next
morning the child's hat was found on the bank of the Lehigh
river, something over a mile from Allentown, and about one
and a half miles from the livery stable; the point where it
was picked up was in a path which led down the bank where
there was an open space clear of underbrush to the river; here
the water formed an eddy or pool, and was about ten feet in
depth; the distance from the hat to the water was about 22
feet, and a traveled public road leading to Allentown ran
close by.

On the 31st of July the body of the child was found in the water 617 feet from where the hat was picked up ; there were no marks of violence, and so far as could be discovered death was caused by drowning.   On the morning after the child had been taken from the livery stable by her father, he said he had found a place for her in the 6th ward.   He told the coroner and others he had given her to a man from Philadelphia, whose name he did not remember, and made other improbable statements proved to be and here admitted to be false.   If, instead of a helpless child, the occupant of that buggy, driven off in the darkness, had been an adult, the fact that she had not been seen alive afterwards, and Johnson had returned in less than an hour without her, and that she had been found dead in the river with no marks of violence on the body the next morning, and then the further fact had appeared that he had lied about how he had parted company with her, while sufficient to arouse suspicion, these facts alone would not have, perhaps, beyond a reasonable doubt, warranted a verdict against him.   Some violence would have been necessary to accomplish drowning of an adult, and the evidence of such violence would, probably, have appeared on the body and clothing ; there would too, probably, have been evidence of struggle on the bank.   The body of an adult, thus found in the water without marks of violence, would have suggested the reasonable hypothesis of suicide or accident, and no suspicious conduct of Johnson preceding the event, or falsehood subsequent to it, would have been sufficient to warrant, beyond reasonable doubt, a conviction of murder.

But this unsuspecting, helpless child, in the darkness, could have been taken to that lonely place, thrown into that deep water and drowned, and her body have been taken therefrom six days after without a mark upon it.   She was as helpless in his hands as would have been a kitten, and had less tenacity of life.   The child was in the custody of the father when last seen alive, between eight and nine o'clock in the evening; they were in a vehicle which could reach the point where she was found in fifteen minutes; the father could return to the stable from that place in another fifteen minutes without her; being helpless, wholly in his power, and it being incredible she could have wandered from the city, where, it is argued, he may have left her, that distance to that lonely place on the river bank,—for

the road was seldom traveled in the night time,—the jury was warranted in assuming she was taken there in the buggy; more especially was this assumption warranted, when defendant at no time before the trial claimed that he had abandoned the child on the street or road, but asserted always, that he had delivered her to some person to be cared for.

The finding of the hat on the bank early the next morning indicates, with almost absolute certainty, she had been cast into the water from the bank where the hat was found; that the body had not floated there from a point higher up the stream. Finding it the next morning indicated with the same certainty that her death occurred the night before.

We have then the death of the child, at a place, in a manner, at a time, inexplicable on any reasonable theory other than that she was murdered. The theory suggested by the defence, that this four year old child may have been put down in the streets of Allentown, and then after dark have wandered more than a mile to this place on the river bank where there was an opening through the underbrush to the water, and there have fallen in, at the very best, is possible, but so remotely possible, that it is wholly unreasonable; it is directly opposed to all experience, and flatly contradicts our knowledge from observation of the conduct of children of such tender years.

Then follow the contradictory statements and admittedly flat falsehoods, as to what he had done with his child. He alone knew what had become of her in the forty-five minutes that had passed between the time he left the livery stable and his return without her. The next morning he told Annie Keller, who had been sent to get the child for a Mrs. Roberts, that he had left her with some people in the 6th Ward—they had such a funny name he could not remember it, but he would see if they would give her up; then, on the Friday following, told the same witness he had seen them, and they would keep her a couple of weeks yet. He told George Zimmerman he had given her to a tall man about forty years of age with a red moustache, who said he was from Philadelphia. He said to officer Smith, the man he gave the child to must have thrown her into the river, —that he had forgotten the name of this man,—that when driving with the child in the buggy he had met him between the Lehigh Valley Railroad and the Terminal Depot; that two lit-

tle boys were following him; that he asked the stranger where he could put a child, and that he agreed to take it, and did take it. That this occurred in daylight, about half past seven o'clock. That he saw the stranger go in the direction of the Lehigh Valley Depot with the child, and that it was still daylight when he returned to the stable with the horse and· buggy. He repeated the same story in substance to coroner Kramer at his place of business the morning before the inquest, with this variation however,—instead of being in a buggy, he said he was walking, and instead of half past seven, he said it was between four and five o'clock in the afternoon.

The motive for destroying the child, the commonwealth argued, was to get clear of the burden of caring for and maintaining it. His wife, by legal proceedings, had sought to compel him to support it; when she failed, she left the child with him; then he sought to shift the burden on his own mother; when she returned it to him on the morning of the 25th, after unavailing attempts to get a place for it that day, annoyed and exasperated by its presence, he deliberately drowned it. Then it was further argued that the fact that he left her little bundle of clothing at the stable, where it remained until the inquest, six days after, indicated that he did not leave the stable with the intention of providing a home for her, but intended to end her life.

The circumstances here, with almost absolute certainty, shut out any inference of either suicide or accident, and pointed beyond a reasonable doubt to murder; the certainty as to how the death had been brought about was heightened by proof of his conduct before and after the event, and pointed beyond reasonable doubt to the defendant as the murderer, and not even remotely to any other. All the proven circumstances are irreconcilable with any other theory than that of deliberate murder; they are irreconcilable with any reasonable theory consistent with defendant's innocence. To establish by circumstantial evidence the guilt of one accused of murder, in most cases, both the corpus delicti and the guilt of the defendant are inferential; when there is no eye witness to the direct cause of death, the body of the offence and the identity of the murderer must be established inferentially, and often the same circumstances, as in this case, tend to prove both. If this man, instead of

saying to his employer, when he borrowed the horse, that he
wanted to take his child home, had said he wanted to drive
down to the river and drown her, the learned counsel for the
defendant would scarcely have argued that the conviction was
wrong, and yet the proof both as to the body of the offence
and the identity of the murderer would still have been of the
same character, inferential.   His conduct here, both before and
after the event, the motive for murder, her helplessness, the
mode, place and time of her death, are just as significant and
induce as firm if not firmer belief of guilt than an open, defi-
ant declaration of guilty intent on his part.

Hence, we are of opinion the 6th, 7th and 8th assignments
of error, on the facts here, are without merit.   The evidence
was sufficient to warrant the inference that the child had been
murdered, and it pointed beyond reasonable doubt to the de-
fendant as the murderer; unreasonable doubt or hypothesis
ought not to move juries to acquit.

The 1st to 5th assignments, inclusive, allege error in the
admission of testimony as to declarations of defendant after he
was accused of the crime.   It will be noticed the declarations
were not of themselves incriminating; all were explanatory or
exculpatory.   It was established that he took the child from
the livery stable on the evening of the 25th; she was last seen
with him in the buggy; the condition of the body was such
that it was at first difficult of identification.   When the coroner
first saw him, the morning before the inquest, his object was
identification; hence his first inquiry of defendant was, did " he
have a child and how old was it?"   On answering this, then
he asked where the child was.   Then followed the statement
by Johnson, that he had given it to a stranger who said he lived
in Philadelphia, with circumstances of time, place, and conver-
sation between himself and the stranger.   After he had narrated
all this, then came the alleged promise by the coroner, as fol-
lows: " If you produce this child you are free, if not I must
hold you until the inquest this evening at half past seven
o'clock."   There was not the semblance of promise preceding
the statement made by Johnson; the declaration, that if John-
son produced his child he would be free, had not stimulated
hope so as to prompt him to falsehood, because made after the
utterance of the falsehood.   All of his declarations made to the

coroner after this announcement were excluded by the learned president judge of the court below. The statements admitted, then, were voluntary; there was no inducement to falsehood by promise of immunity. To exclude a voluntary confession of guilt, some inducement must be held out to prompt to falsehood, and of this the trial court must be the judge in the first instance, and their ruling will be set aside only for manifest error: Fife v. Commonwealth, 29 Pa. 429. The court below, having before it all the circumstances under which the statement preceding the promise was made, was clearly of the opinion that it was voluntary. There is no manifest error in this, nor any semblance of error. The case of Commonwealth v. Harman, 4 Pa. 269, cited and relied on by counsel for defendant, is wholly different from the one before us. There, the prisoner was sworn by the committing magistrate, and threatened with imprisonment if she did not tell the truth. Of course her statement under such circumstances was inadmissible.

It has been so often ruled that statements voluntarily made by one in custody are admissible, that it is unnecessary to notice the alleged error in the admission of the testimony as to declarations made to the other witnesses by defendant after his arrest. They appear to have been altogether of his own volition, with a full knowledge of his rights. That these statements were falsehoods made them proper evidence on part of the commonwealth, as tending to establish guilt.

The learned judge of the court below in his charge presented every aspect of defendant's case to the jury, certainly in as favorable a light as the law and the evidence warranted, and they have found that he, with deliberation, premeditation and malice aforethought, murdered his own child. A most careful review of the whole record satisfies us the trial was without error.

The judgment is affirmed and appeal dismissed. It is directed that the record be remitted to the court below that the sentence be carried into execution according to law.