Argued 23 October, decided 21 November, 1906.

### STATE *v.* JENNINGS.

87 Pac. 524, 89 Pac. 421.

COMPETENCY OF CONCLUSIONS—OPINION EVIDENCE.

1. Where the facts observed by a witness can be accurately stated to a jury, the evidence should be limited to such a recital and the witness should not be permitted to state his deductions from such facts.

For instance: A witness who saw the surroundings soon after a homicide by shooting should not be allowed to state his opinion as to the place from which the bullet came, where the conditions observed can be adequately described.

RESERVING GROUND OF APPEAL—QUESTION NOT RAISED AT TRIAL.

2. Objections to evidence not made when the exception is saved will not be considered on appeal.

Thus: An objection to certain questions because they show an attempt of a party to impeach his own witness, in violation of Section 850, B. & C. Comp., does not support an objection that the party has not laid a foundation of surprise.

RIGHT TO IMPEACH ONE'S OWN WITNESS.

3. Under Section 850, B. & C. Comp., a party may impeach his own witness by showing that on previous occasions the witness has made statements inconsistent with his present testimony, in order to offset any unfavorable effect of the present statements.

CONTRADICTING WITNESS BY PREVIOUS WRITTEN STATEMENT.
4. Where a witness denies the correctness of a writing purporting to contain a previous statement at variance with his present testimony, the impeaching evidence is not limited to the writing, but oral evidence may be received of what the witness actually said.

CRIMINAL LAW—STATEMENT BY DEFENDANT AS EVIDENCE.
5. A statement made by a witness called under Section 1261, B. & C. Comp., to testify before a district attorney sitting as a grand jury, is competent evidence though it is not complete, if the witness admits that it is correct as far as it goes.

SAME—INCONSISTENT STATEMENTS.
6. Declarations of defendant concerning the commission of the crime charged are admissible against him, to prove that he has made false or inconsistent statements regarding the crime, when followed by evidence of their falsity or inconsistency.

APPEAL—ERROR NOT PRESUMED.
7. Error on the part of a trial court is never presumed, the presumption being that evidence was received or excluded as required by law, unless the contrary appears.

EVIDENCE—DECLARATIONS OF THIRD PERSONS—HEARSAY.
8. In a criminal case testimony that a third person said he had committed the crime charged against defendant is incompetent, being hearsay.

CRIMINAL LAW—BILL OF EXCEPTIONS—AMENDMENT.
9. Where a bill of exceptions, through mistake has been so made up as not to state the truth, it may on proper showing and notice be amended *nuc pro tunc* at a subsequent term and before the hearing in the supreme court, but the state which has argued and submitted its cause on a bill of exceptions stating the truth may not obtain from the trial court by way of amendment a new bill after the case has been decided against it on appeal, for the purpose of arguing in a petition for a rehearing that the error shown by the original bill was harmless.

From Josephine: HIERO K. HANNA, Judge.

Statement by MR. JUSTICE HAILEY.

Jasper Jennings and his sister Dora were jointly informed against by the District Attorney of the First Judicial District of this state for the crime of murder in killing their father, Newton M. Jennings, on September 7, 1905, in Josephine County, Oregon. In January, 1906, he was tried separately, convicted of murder in the first degree, and sentenced to be hanged, and appeals to this court. Five assignments of error are specified, and two of these can properly be considered as one. The record before us is meager in the extreme for a case involving human life, and the bill of exceptions covers only 25 pages of type-written matter, and several of these pages are erroneously filled with arguments of counsel on both sides, ad-

dressed to the court upon questions of the admissibility of evidence, and properly form no part of the bill of exceptions, as no exceptions are based thereon.    REVERSED.

For appellant there was a brief and an oral argument by *Mr. H. D. Norton.*

For the state there was a brief over the names of *A. M. Crawford,* Attorney General, and *A. E. Reames,* District Attorney, with an oral argument by *Mr. Clarence L. Reames.*

MR. JUSTICE HAILEY delivered the opinion.

1. The record discloses that the deceased was shot during the night while in his bed in one corner of a small room in his home, and that his two daughters, Dora and a younger sister, occupied a bed in the opposite corner of the same room. L. B. Wickersham, one of the first persons to arrive at the house after the discovery of the homicide, was called as a witness for the state, and after testifying that "the corner of the room was spattered with blood," was asked: "Was there anything in that to indicate the direction it traveled, or, taking the direction it traveled from his head, was there anything to indicate in that where the shot was fired from?" To this question the defendant objected as calling for the opinion of the witness on a matter exclusively for the jury to determine, and therefore incompetent. The objection was overruled and an exception saved, and the witness answered: "The blood being in the corner, of course the bullet must have been fired—from the position of the bullet and the position of the head, that is—opposite from the corner in which the blood was found, which would be probably 10 feet north from the door inside." This question clearly called for the opinion of the witness as to where the shot was fired from, and his answer shows that he so understood it. The district attorney evidently regarded the answer as a conclusion of the witness and not a detail of facts from which the jury could draw its own conclusions, for he immediately asked the witness to "describe to the jury the appearance there—well, the way the blood was spattered in the corner, giving them the conditions there so that they might arrive at a conclusion as to where this

shot was fired from." But the witness failed to do more than
say the corner of the room was covered with blood and portions
of skull. There is nothing in the record as to the position of
the body, or the course of the bullet through the head, or the
position of the head, or any other fact from which a conclusion
could be drawn as to the direction or place from which the bullet
was fired. These are all facts which could be sufficiently de-
scribed and detailed to the jury so as to enable it to draw its own
inference and conclusions, and in such cases opinion evidence is
not admissible: *State* v. *Barrett,* 33 Or. 194, 196 (54 Pac.
807) ; *State* v. *Mims,* 36 Or. 315, 320 (61 Pac. 888). It was,
therefore, error to permit the witness to give his conclusions as
to the place from which the shot was fired. He should have
been asked to detail the conditions as they were and the jury
allowed to draw its own conclusions from the facts thus de-
tailed. His conclusion as to where the shot was fired from,
based upon what he saw, might be very different from that of the
jury drawn from a description of the condition of the room, the
position of the body, and other necessary facts upon which to
base a conclusion.

2. John Evett, third cousin of defendant, and a witness for
the state, who had testified at the coroner's inquest held over the
body of Jennings on September 8, 1905, after testifying that he
lived in a cabin near the house in which Jennings was killed,
and that on the night of the killing he had heard the defendant
let down and drive through some bars near his cabin, about 12
o'clock, also testified that he afterwards heard a shot that night
and that it sounded in the direction of the house where Jen-
nings was killed. He was then asked:

"Do you know what time it was?"
and answered,

"Well, sir, I imagine it was somewhere in the neighborhood
of 4 o'clock; to the best of my knowledge; I could not say posi-
tive."

To show that he had, at another time, made a different state-
ment as to the time when he had heard the shot fired, he was
asked if he had not been called as a witness at the coroner's in-

quest September 8th, and was asked to identify his signature to the notes of his testimony made at the inquest, and did so, and was then shown the notes of his testimony taken by the coroner's clerk, which are copied into the record, as follows:

"Jno. Evett, Granite Hill, is sworn.　Resides across road from house.　Slept there last night.　Saw him at Sill's barn at 7 p. m.　Asked about Ryle.　Stayed at house a few minutes. Chapin came later.　Heard music and dancing until quite late. Heard shot fired about 12 o'clock.　Heard team stop at bars and drive on.　After that heard shot.　Made quite noise.　Sounded like shot.　Heard no other noise.　Was not quite awake.　Nothing else heard.　Only shot.　Couldn't tell where.　Report sounded in direction of house.　Heard of no trouble with family.　Don't know whether was drunk or not.　Has 25-35 gun there in camp. Knows of no pistol.　　　　　　　　　　　　　John Evett."

He was then asked about the time he heard the shot as stated in the notes of his testimony taken at the inquest, and said, in effect, that it was a mistake, and he was positive he did not say he heard the shot fired about 12 o'clock when he testified before the coroner.　He also said that one Mert Sills had been requested to take down the testimony at the inquest and did so, and that when the statement in evidence had been presented to the witness it had not been read to him, but he had been told to "sign that right here; sign your name under this," and that he did so without reading it over.　Thereafter the coroner, W. H. Flanagan, was called as a witness for the state, and, after testifying that he did not think the testimony of Evett taken at the inquest had been read by or to Evett before signing, and after having been shown such testimony, he was asked,

"That statement that he heard the shot about 12 o'clock—do you remember how that was in his testimony?"

An objection was interposed on the ground that the state was attempting to impeach its own witness and the question was incompetent, irrelevant and immaterial.　The objection was overruled and exception allowed, and the witness answered:

"Why, it was as near as I can recollect: this was his evidence, and I asked him what time, if he heard any noise or shot or anything.　He said about—along about that time of night. I asked him what time as near as he could judge. . He said

something—he said it was 12 or about 12 o'clock, from what he could judge of the time he had been asleep; it was along about that time. I didn't know that it was put down just at 12, but I see here the clerk put the time at 12 o'clock. He said as near as I can recollect it was about as near as he could judge the time from the time he went to bed; it was about 12 o'clock or a little after, along there, but I see my notes here say 12."

It is contended on the part of the appellant that the court erred in admitting this testimony without some showing of surprise on the part of the state in the testimony of the witness regarding the time when he heard the shot, and further that the testimony of the witness having been reduced to writing, it was the only evidence which the court should have admitted of former statements of the witness. The first contention is untenable for the reason that no such objection was made on the trial to the admission of the testimony, the objection made being that it was not admissible because it was intended to impeach the state's own witness.

3. The record shows that on the night of the homicide the defendant started from his cabin about 6 o'clock in the evening with a horse and cart and drove down to his father's house where he stopped for a few minutes, got his overcoat, and during that time had some conversation with his sister Dora, and then drove on down the road through the bars near the witness Evett's cabin, and on to the Roberts place and spent the evening there, and came back during the night and drove by his father's house, passing through between 12 and 1 o'clock, and reached his own cabin between 12 and 2 o'clock, and there is no evidence that he left the cabin again that night, and his partner, Harvey, testified that they slept in the same bed. It was evidently the theory of the state, in view of these facts, that the homicide, if committed by the defendant, was committed about 12 o'clock at night, and the testimony of the witness that the shot was fired about 4 o'clock in the morning, was clearly prejudicial to the theory of the prosecution and affected the merits of the case, and under Section 850, B. & C. Comp., the prosecution had a right to show that the witness had made at other times statements inconsistent with his present evidence. As

stated in *Langford* v. *Jones,* 18 Or. 307, 326 (22 Pac. 1071), "the object of the section (850) was to prevent the party from being prejudiced by the evidence of his own witness."

4. It is urged, however, that the testimony of the witness Evett taken before the coroner, having been reduced to writing, no other evidence of his statement should have been permitted to go to the jury. Such written evidence, if admitted by the witness to be correct, would undoubtedly have been the best evidence of what he stated at the inquest, and would have excluded oral statements of his testimony: *State* v. *Steeves,* 29 Or. 85, 102 (43 Pac. 947). But the difficulty in this case is that the witness, while admitting his signature to the testimony taken at the coroner's inquest, said in effect that his testimony had not been correctly taken by the clerk; and it then became necessary to prove his statements by the evidence of some one who was present and heard him testify at the inquest. It also became necessary to prove that the testimony of the witness as taken by the clerk and shown in the statement signed by the witness was correct. If a witness admits that he made statements imputed to have been made by him as fully as claimed to have been made, further proof of the fact is unnecessary, but when the witness denies or does not directly admit that he made the statements, impeaching proof should be permitted to be given: *Illinois Cent. R. Co.* v. *Wade,* 206 Ill. 532 (69 N. E. 565); *Ray* v. *Bell,* 24 Ill. 444; *Atchison, T. & S. F. R. Co.* v. *Feehan,* 149 Ill. 202 (36 N. E. 1036). The witness in this case, having denied the correctness of the statements contained in the writing introduced to show that he had made a contradictory statement before the coroner's inquest as to the time he heard the shot, the statement of the coroner as to his testimony at the inquest was admissible: *Sullivan* v. *Jefferson Ave. Ry. Co.* 133 Mo. 5 (34 S. W. 566, 32 L. R. A. 167).

5. The third assignment of error is in the admission of the following written statement, made by the district attorney and signed by the defendant, whose signature was identified by the sheriff:

"Sept. 25, 1905.

I have heard my mother say lots of times that she wished my father was dead, and that he would be killed. She told him that the Bryson boys would kill him. She threatened him with Will and De Witt Bryson. I can't figure out any other way than that my mother had some one kill my father.

Jasper Jennings."

This was objected to as incompetent, irrelevant and immaterial. It appears from the record that when this instrument was offered in evidence the jury retired and the defendant testified in his own behalf before the court regarding the making of this statement, and, if his testimony, which is not contradicted, is accepted as true, there was much more said by him in his conversation with the district attorney than is contained in the statement, and in view of the powers conferred upon a district attorney under our present law, which practically give him all the powers of a grand jury (B. & C. Comp. § 1261), it would seem but fair to the defendant, when reducing his statements to writing, to state fully therein all that he said, so that, in case the statement should thereafter be used against him, it would include all of his statements to the district attorney, rather than the conclusions of that officer drawn from the statements of the defendant. In this case, however, the defendant admitted that he had said "exactly what is on the statement," but, as appears from his testimony before the court, several questions were asked him by the district attorney which do not appear in the statement, and would, with his answers thereto, somewhat alter its effect if he made them and they had been included in the statement. The statement, however, was not inadmissible because it did not contain all that he claimed to have said to the district attorney. While the record in the case shows that the statement offered was voluntary, we think, in so serious a case as this, involving the guilt or innocence of one charged with the gravest crime known to our law and punishable by death upon conviction, that the spirit of our laws and institutions, and the interests of justice to all, require the exercise of the greatest care and caution upon the part of a prosecuting officer, clothed as he is with so much power, in receiving and reducing to writ-

ten form any statements made to him by the accused, and that such writing should fully set forth all that the accused has said relevant to the crime charged, and avoid the statement of any conclusion such officer might draw from the oral testimony of the accused. The desire of a prosecuting officer to convict in any cause, however strong against the accused, should never cause him to disregard any of the benefits or privileges accorded to the defendant by the law.

6. The fourth alleged error is in the admission of the following statement, signed by the defendant, whose signature was identified by S. F. Cheshire, county clerk, before whom the defendant signed and swore to the same:

"VOLUNTARY STATEMENT OF JASPER JENNINGS.

Some time ago I was arrested. About two weeks after the murder of my father, Dora and I were coming to town in the buggy to see Norton about fixing up guardian papers. When we got to the Upper Fork of Louse Creek, just above the Forest Queen mine, I accused Dora of killing my father. She denies it for a long time, but about the time we got to the lower ford, at the gate, she broke down, crying, and told me all about the killing of my father. She said, 'I did kill father the night that you went down to see Blanch Roberts.' Then she made me promise not to tell any one about it. Then she asked me what made me suspicion her. I said, 'Dora, it looked suspicious to me from what you said before this happened that you should have done it.' I says, 'You told me the evening I went down to see Miss Roberts that father had been drunk for a day or two,' and she had stood it just as long as she was going to. She told me that there was some beer in the case in the kitchen, and told me to drink what I wanted of it and throw the rest away. She says, 'He has drunk about all of the God d—n stuff he is ever going to drink.' I opened a bottle, and took a small drink, and threw the bottle out of the door. I do not like beer and cannot drink it. When we were going to town in the buggy, Dora told me that she asked Jimmy, in the evening before she killed father, where my gun was. She said Jimmy told her that it was up in the cabin in the left-hand corner as you go in the cabin. She said: 'About 12 o'clock I went up to your cabin and "eased" in and got your gun, then went back home, and father was lying in the bed asleep. I put the gun up to his head and shot him. He never moved. I then jumped into bed and laid there until everything was quiet, and then got up and put on

a pair of your shoes and took the gun and went and hid it. I then went back to the house and took off both pairs of shoes, undressed, and put out the light, and went to bed. I slept until Jimmy woke me up next morning.' I am not sure whether she told me she put on the shoes before she went to the cabin or afterwards.

"As soon as I heard father was shot, my first or second thought was that Dora killed him, because she had a good many times in my presence threatened to kill him, and I took my pistol away from the house because I was afraid she would carry out her threats. I gave the pistol to brother John when he went away. About a week before father was killed, Dora asked me where my gun and pistol were. She did not at the time say what she wanted to do. The next day or so I asked her what she wanted with my gun and pistol, and she said she wanted them to protect the house and keep any one from stealing her money. After she told me she had killed father, I asked her what she did it for, and she said, 'Because I have (?) him and I thought he had some money.' I asked her if she got any money, and she said, 'No.' The same evening she told me about killing father, while we were going home, Dora asked me if I supposed any one suspicioned her, and I told her I had not heard anything about anything of the kind. When Moody came down to the jail the other day, he told me he was sure Dora killed my father. I asked Dora where she hid the gun, and she said: 'You will never see your gun or hear tell of it again. It is gone for good.' I asked her if she hid it in the shaft, or the creek, or the tunnel; but she never would tell me what she did with it. When Dora and I were coming to town, the day she told me about the murder, we overtook Mrs. Ryel and Mabel Ryel just the other side of the forks of the Jump-Off-Joe road and the Granite Hill road. When we caught up with these people, Dora would not talk with me any more about the murder. I have made the foregoing statement voluntarily and of my own free will, and no inducements or promises whatever were made to me by any one before I made the same.                    Jasper Jennings."

These statements signed by the defendant were offered to prove that the defendant had made at different times inconsistent or false statements regarding the commission of the crime charged. Declarations of a defendant concerning the commission of a crime for which he is being tried are admissible against him to prove that he has made false or inconsistent statements regarding such crime, when followed by evidence of their falsity:

Underhill, Criminal Ev. § 116; *People* v. *Arnold,* 43 Mich. 304 (5 N. W. 385, 38 Am. St. Rep. 182) ; *State* v. *Carroll,* 85 Iowa 4 (51 N. W. 1159) ; *Mora* v. *People,* 19 Colo. 262 (35 Pac. 179) ; *People* v. *Hughson,* 154 N. Y. 163 (47 N. E. 1092) ; *Walker* v. *State,* 49 Ala. 398; *Commonwealth* v. *Johnson,* 162 Pa. 71 (29 Atl. 280) ; *Smith* v. *State,* 29 Fla. 422 (10 South. 894) ; *State* v. *Oliver,* 55 Kan. 714 (41 Pac. 954).

7. The question, however, of the falsity or inconsistency of these statements is not before this court. That error, to be available upon appeal, must be made to appear affirmatively from the record and will not be presumed, has been so often held by this court that it is unnecessary to cite the many authorities so declaring. The statements received in evidence being admissible if false or inconsistent, and the record being silent as to the evidence of their falsity or inconsistency, this court cannot presume that no evidence was introduced to that effect, but, on the contrary, must presume that such evidence was given.

8. The proffered testimony of Blanch Roberts to the effect that Dora Jennings, codefendant not on trial, had told her that she, Dora, had committed the crime, was properly excluded: *Latshaw* v. *Territory,* 1 Or. 141; *State* v. *Drake,* 11 Or. 396, 402 (4 Pac. 1204) ; *State* v. *Fletcher,* 24 Or. 295 (33 Pac. 575).

There being error in the admission of the opinion testimony of the witness Wickersham, the judgment of the lower court will be reversed, and a new trial ordered.     REVERSED.

Decided 9 April, 1907.

ON MOTION FOR REHEARING.

PER CURIAM: 9. Since the decision of this case, and within the time to petition for rehearing, as extended on application of the state, there has been filed, without leave of the court, what is asserted to be an amended bill of exceptions, but which is subsantially a new bill; and it is insisted that it now appears that the error discussed in the briefs and at the argument, and upon which the case was decided, was harmless. It is not claimed that the original bill was erroneous in any particular, or did not state the truth, but only that it did not state facts sufficiently in

detail—to amplify which was the purpose of the so-called amendment.

Where a bill of exceptions, through inadvertence or mistake, has been so made up as not to state the truth, it may, upon proper notice and showing, be amended *nunc pro tunc* at a subsequent term and before the hearing in this court so that it will accord with the real facts: *State ex. rel.* v. *Estes,* 34 Or. 196 (52 Pac. 571) ; *Bloch* v. *Sammons,* 37 Or. 600 (55 Pac. 438; 62 Pac. 290). It is doubtful whether this rule of practice, liberal as it is, supports the right in a party to obtain by way of amendment to a bill of exceptions a substantially new bill after the adjournment of the term: *Arvilla* v. *Spaulding,* 121 Mass. 505. But, however this may be, there is no law permitting a litigant, who has argued and submitted his cause on a bill of exceptions, which states the truth, to obtain from the court below by way of amendment practically a new bill, after the case has been decided, for the purpose of arguing in a petition for rehearing that the error shown by the original bill was harmless. A bill of exceptions, when settled, signed and filed, becomes a part of the record, and stands on precisely the same footing as any other record (*State ex. rel.* v. *Estes,* 34 Or. 196, 204, 52 Pac. 571), and it will not be claimed, we think, that, where parties have submitted a cause for decision on a record as made up, either of them can, after the decision, cause a new or amended record to be substituted so as to add to or take from the questions presented: 3 Cyc. 144; *Kerley* v. *Vann,* 52 Ala. 7.

The petition for rehearing is denied.

REVERSED : REHEARING DENIED.