Commonwealth *v.* Lettrich, Appellant.

Argued January 18, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

*Abraham Fishkin,* with him *Leonard H. Marks,* for appellant.

*Earle R. Jackson,* Assistant District Attorney, with him *Russell H. Adams,* District Attorney, and *Louis L. Kaufman,* for appellee.

OPINION BY MR. JUSTICE LINN, March 22, 1943:

The jury found appellant guilty of murder of the first degree and fixed the penalty at life imprisonment.

The only question meriting discussion is raised by assignments of error asserting that, apart from the confession, there was not sufficient evidence to go to the jury to establish the corpus delicti.

The appellant was indicted for the murder of an eight-day-old child. It was born in the early morning of November 1, 1941, in the Allegheny Valley Hospital. The mother and child were discharged from the hospital on Saturday evening, November 8th, at about nine o'clock and left the hospital in the company of defendant who carried the child. The child's mother was defendant's younger sister who, at the time of the trial, was 21 years old; the defendant was 26; neither was married. They lived at home with their parents near the town of Tarentum. Defendant testified that she graduated from the eighth grade in public school and, for three summers, attended a Slavish school. She did housework at home and at times was employed by others in the same work. In her confession, made in the Allegheny County Detectives' Office, she stated that almost immediately after leaving the hospital, and after sending her sister home in a bus, she suffocated the child by stuffing pieces of Kleenex tissue-paper into its mouth and (omitting details) subsequently concealed the body in the cellar of their home under some papers. On the following Thursday, November 13th, when her family went to market, she burned the body in the furnace. At the trial, she testified in support of her plea of Not Guilty and denied the truth of the confession; her evidence was that, shortly after receiving the child, she gave it to the putative father near the hospital where she found him waiting in his car. He was called by the Commonwealth and denied all her assertions implicating him in the incident.

The Commonwealth concedes appellant's contention that there must be proof of the corpus delicti before the jury may consider the confession; that a conviction cannot be supported on the evidence of the confession alone. The order of proof is of course discretionary. In this

case the Commonwealth contends the rule is satisfied, and, in support of that contention, points to other facts, to appellant's declarations and to her acts and conduct, given in evidence by other witnesses, as sufficient to go to the jury to show compliance with the rule. We shall consider them, first, however, noting the principle commonly applied and stated in our cases to be, that "The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt. If the jury believed that the statements made by the prisoner of the occurrence were false, his falsehood was therefore at least a circumstance affording some presumption against his innocence . . ." *Cathcart v. Commonwealth,* 37 Pa. 108, 113. See also *McMeen v. Commonwealth,* 114 Pa. 300, 306, 9 A. 878; *Commonwealth v. Johnson,* 162 Pa. 63, 68-71, 29 A. 280; *Commonwealth v. Spardute,* 278 Pa. 37, 43, 122 A. 161. See also 2 Wigmore, Evidence (3rd Ed.) p. 120, section 278.

The elements relied on by the Commonwealth to show compliance with the corpus delicti rule are as follows and they must be considered as a whole.

1. Defendant's sister, and the hospital nurse, testified (and defendant admits it) that the defendant received the child at the hospital at the time her sister and the child were discharged and carried it away. By doing so, she assumed responsibility for such care as the child required.

2. The child weighed something over eight pounds; the nurse and the obstetrician testified that it was a normal baby. The child, then, apparently well, was in defendant's custody, with the duty of caring for it, at about nine o'clock P.M. on November 8th; there is no evidence that it was seen again, alive.

3. The child could not move about alone and, to live, required frequent nourishment and attention, a responsibility assumed by the custodian, the defendant.

4. A witness, Len Richardson, testified to declarations and acts of defendant in the following circumstances. He was defendant's friend; she asked him to drive her in his car to the hospital to bring home her sister and child. He took her there for that purpose and waited outside in his car while she went in. She returned in about twenty minutes and, while he did not see her come out of the hospital, he first saw her alongside his car carrying a bundle about 24 inches long and 10 inches in diameter; she put this bundle in the back of the car, and told him it contained her sister's soiled clothes to be taken home to be washed. He asked where her sister was and she replied that her sister had gone out the back way and was taking the child to a Dr. Richardson to be adopted. In her testimony in defense, she denied Len Richardson's evidence. The record shows her declaration that her sister was taking the child to Dr. Richardson for adoption was false. Among other things, she testified she went to the hospital by bus instead of going with Len Richardson.

5. This witness, Len Richardson, also testified that he drove the defendant from the hospital to her home; that he saw her get out of the car and carry the bundle to the house. He testified she stated she did not want her father to see that she had brought home the soiled clothes. She returned to the car five to ten minutes later and he then drove her to a Slavish club in the neighborhood. This evidence defendant also denied.

6. Dr. Archie W. Richardson, the obstetrician at the hospital, testified that ". . . a few days after the sister went home from the hospital," defendant ". . . came in and paid the bill for her sister's care." He asked her ". . . how the baby and mother were getting along and told her to have them come in for a check-up;" defendant answered (in the words of the doctor) ". . . that everything was all right and she would tell them to come in . . ." The record shows that at the time she said the child was alive, she knew it was dead.

7. On the afternoon of January 17, 1942, County Detective Weber called at defendant's home and talked with defendant and her sister. He testified that defendant stated to him that ". . . the baby was taken from the hospital and given to Dr. A. W. Richardson and he had taken it—she, Wilma, [defendant] and he had taken it to Freeport. After driving around some strange streets . . . he stopped in a lonely place and went in between two houses with the baby and in about fifteen minutes he returned and said the baby had been placed. She said she asked about adoption papers and he said they would get those later." She knew that these declarations also were false.

8. At the trial defendant testified that, immediately after leaving the hospital with the child, she gave it to its putative father, a statement of fact which he testified was not true.

Considering the helpless condition of the child in her custody, her false declarations of various facts, repeated to various persons, and acts accompanying the declarations, defendant must have intended them to divert suspicion from her; they are, we think, sufficient to satisfy that measure of caution admonishing the judge when he comes to determine whether the Commonwealth has produced sufficient evidence to be submitted to the jury to establish the fact of crime under proper instructions. The conduct of the defendant who made the false declarations and performed the acts related by the witnesses must be judged by the rule that the attempts to divert suspicion constitute conduct "indicatory of guilt." [1] The question at this point is not whether defendant committed the murder, but whether the evidence should go to the jury, with proper instructions, to determine that the child was dead and that it came to its death by felonious act; in other words, that there was sufficient evidence of

---

[1] *Cathcart v. Commonwealth*, supra; *McMeen v. Commonwealth*, supra; *Commonwealth v. Johnson*, supra; *Commonwealth v. Spardute*, supra. See, also, 2 Wigmore, Evidence (3rd Ed. 1940) p. 120, section 278.

the corpus delicti to go to the jury. The inquiry into the sufficiency of the evidence for the particular purpose under consideration, was cautionary, a precaution against conviction on an extra-judicial confession alone. The purpose of the rule is to prevent conviction on extra-judicial confession when, in fact, no crime was committed. In practice, the rule requires that the jury may not consider such confession as evidence of defendant's guilt of the crime charged, unless the Commonwealth shall have produced evidence sufficient to convince the jury beyond a reasonable doubt that the crime charged was committed by someone. Even though it was determined that the evidence of the corpus delicti was sufficient to go to the jury, the burden still remained on the Commonwealth to show beyond a reasonable doubt on the whole record, which then included the confession, that defendant committed the felonious act.

This application of the rule is in accord with our cases. It has been considered and applied in many familiar cases [2] from *Gray v. Commonwealth*, 101 Pa. 380, 386, to *Commonwealth v. Turza*, 340 Pa. 128, 134, 16 A. 2d 401. In the course of his instructions to the jury the learned trial judge affirmed a point presented on behalf of the defendant: "Before the jury can give any consideration to the confession of the defendant, it must first be satisfied beyond a reasonable doubt that the infant child allegedly murdered is in fact dead and that such death was caused by criminal agency."

It is elementary that the term corpus delicti with respect to homicide does not require the Commonwealth to produce the body or part of the body of the victim. The rule is satisfied by evidence, other than the confession,

[2] *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87; *Commonwealth v. Puglise*, 276 Pa. 235, 120 A. 401; *Commonwealth v. Johnson*, 162 Pa. 63, 29 A. 280; *Commonwealth v. Bishop*, 285 Pa. 49, 131 A. 657; *Commonwealth v. Coontz*, 288 Pa. 74, 135 A. 538; *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301; see, also, *Commonwealth v. Eng Chuing*, 150 Pa. Superior Ct. 445, 28 A. 2d 710.

from which the jury on proper instructions may find that the child's death resulted from a felonious act. The fact may be found on circumstantial evidence. In this case the admitted facts, defendant's false declarations and her acts in conformity with those declarations, furnish a substantial basis for submitting the evidence to the jury. This conclusion is supported, too, by comparison with other cases of infanticide in which confessions were received. See *Rex v. McNicholl,* [1917] Ir. R. 557; *Attorney General v. Edwards,* [1935] Ir. R. 500; *Regina v. Woodgate,* [1877] 3 New Zealand Ct. of App. 320; *Makin v. Atty Gen'l for New South Wales,* L. R. [1894] A. C. 57; *People v. Kirby,* 223 Mich. 440, 194 N.W. 142.

In *Rex v. McNicholl,* supra, in which defendant was convicted of the murder of his illegitimate child, CAMPBELL, L.C.J., said: ". . . the alleged victim is an infant only a few months old and incapable by itself of any change in its custody or abode. The accused in this case removed the control and custody of his illegitimate child from its mother by a subterfuge, and from that time it has never been seen again. After repeated false statements as to where and how he had disposed of it he finally confessed to having killed it by suffocation within a few minutes after he had obtained possession of it. It is true that the statement in his confession that he had interred its dead body in his mother's grave is apparently false, but was doubtless made in the hope that he might in this way sooth the outraged mother and succeed in persuading her to yield to his passionate appeals not to betray him to justice." *Attorney General v. Edwards,* supra, was a case in which two sisters were convicted of the murder of the illegitimate child of one of them. The body of the child was not found and there was no medical evidence that it died a violent death. The court referred to false declarations made by defendants and acts done by them, and said: "It must not be forgotten that this was a baby less than three weeks old, incapable of independent motion or even of sustaining life for long if left alone. It was open to the jury to draw an inference that

the accused had left the child, alive or dead, in the thickets about the Orchard, or that they had thrown it, alive or dead, into the river . . ." In *Regina v. Woodgate,* supra, the circumstances of the disappearance of the child were held sufficient to go to the jury. In the *Makin* case, there was no direct evidence of the death of the child, yet the circumstances were held sufficient to sustain a conviction. In *People v. Kirby,* supra, the evidence of the disappearance of the child was held insufficient; three judges dissented in an opinion written by Mr. Justice SHARPE.

The assignments of error are overruled and the judgment is affirmed.