640 A.2d 921

COMMONWEALTH of Pennsylvania

v.

**Maurice MARTIN, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1994.

Filed April 22, 1994.

Alan G. Goldberg, Lancaster, for appellant.

John A. Kenneff, Asst. Dist. Atty., Millerville, for Commonwealth, appellee.

Before CIRILLO, BECK and HOFFMAN, JJ.

BECK, Judge:

In this appeal from his judgment of sentence for third degree murder, appellant claims that the evidence at trial was insufficient to sustain the conviction. He also claims that the trial court improperly admitted prior bad acts evidence relating to his treatment of the victim. We find no merit to appellant's contentions and, accordingly, affirm.

Appellant was found guilty by a jury of the murder of four year old James Johnson ("James"), the son of his girlfriend, Deborah Johnson ("Mother"). At trial, the Commonwealth established the following. Appellant lived with Mother, James and the couple's infant daughter in an apartment in Lancaster. One Friday evening in the summer of 1991, appellant punished James for urinating on the curb outside their home. The form

of punishment, which was witnessed by Mother and admitted by appellant, was that James was required to stand on a crate in the couple's bedroom for a period of at least four hours.

Mother fell asleep that evening while James was still standing on the crate; the next morning she left for work and noticed that James was sleeping in his bed. When she returned from work later that afternoon, she checked on her son, who was still sleeping, and noticed that he was snoring very loudly. James did not awaken at all that evening. Mother was scheduled to work a double shift that evening, starting at 11:00 P.M. Before leaving the apartment at 10:50 P.M., she took her infant to a neighbor because she knew that appellant would be going out later that night. She did not check on her son.

During the night and early morning hours, appellant drove to Coatesville to pick up a friend, Vincent Robinson ("Robinson"), who was to lend him money. When appellant arrived to pick up Robinson, James was lying in the back seat of the car and appeared to be sleeping. Robinson accompanied appellant to Mother's place of work and then to the Lancaster apartment. Robinson testified that he saw James open his eyes at some point before he entered or was carried into the house. However, in all the time Robinson was in the presence of James, he never saw the boy stand, walk or talk. Others who visited the apartment that night, including a female friend of appellant and a pizza delivery person, did not see or hear James at all. Robinson and appellant went to sleep at 2:00 or 3:00 A.M. At approximately 7:00 A.M., while appellant was still sleeping, Robinson left the apartment. Before leaving, he saw James on the living room couch but could not tell whether the child was breathing.

At approximately 7:40 A.M., appellant telephoned Mother at work and asked if she would like him to buy her some food for lunch. Mother replied that she did not want him to buy her food. Despite this fact, appellant claimed, he took both children to the supermarket at 8:00 A.M. in order to purchase food for Mother. Once there, claimed appellant, he entered the store with his infant daughter in his arms and left James

in the car. When he returned from the store, James was gone and appellant reported his disappearance to police.

Several witnesses were in the parking lot at the time appellant was there. A fireman, who was sitting in his fire truck at the time, did not see a child wandering around in the lot, nor did he see an adult with a four year old child. An employee of the store, who was sweeping out front, testified that she saw appellant enter the store with an infant in his arms, that less than five (5) minutes later appellant exited the store, approached her, and asked if she had seen a young boy. A Commonwealth re-creation of the events established that from his vantage point at the front of the store, appellant could not see into his car to know whether or not James was in the car. Appellant was interviewed on several occasions by police regarding the disappearance of James. His statements to police contained factual inconsistencies as well as denials, then admissions, about disciplining James that weekend. Ultimately, he was arrested and charged with the child's murder.

The Commonwealth's theory of the case was that appellant hit James in the head on Friday night, causing a subdural hematoma which resulted in his death. Appellant then disposed of the body and claimed that James was either taken or wandered off from the supermarket parking lot. To prove its case, the Commonwealth offered the testimony of a neurosurgeon who explained that the sleeping patterns exhibited by James were consistent with those of a person suffering from a subdural hematoma. In particular, the surgeon testified that the victim would lapse into a coma over the period of a few days and that the loud snoring heard by Mother was likely the result of a blocked air passage caused by the comatose state.

Because James's body never was found, the Commonwealth offered circumstantial proof of his death, including his age, the fact that no one saw him at the supermarket parking lot, the peculiar circumstances of the preceding two days wherein James was not seen conscious or awake by anyone, the inconsistent nature of appellant's statements to police after James's "disappearance," and the failure of hundreds of search volunteers to turn up any evidence of James's whereabouts.

In order to establish the malice necessary to prove murder, the Commonwealth provided testimony from several sources that appellant repeatedly abused James, both physically and mentally. Also offered as evidence by the Commonwealth was a statement made by appellant while in jail which was overheard by another inmate. While on the telephone, appellant said that the police were not looking in the right place, which was the local dump.

■■■ We first address appellant's claim that the evidence against him was insufficient to convict him of third degree murder. We will consider all of the testimony presented to the jury in the light most favorable to the Commonwealth as verdict winner. *Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600, 603 (1989), *rev'd on other grounds,* 532 Pa. 177, 615 A.2d 321 (1992). To prove homicide, the prosecution must establish that James is dead and that his death resulted from criminal means effected by appellant. *Id.* at 581–82, 568 A.2d at 602. In order to prove third degree murder, the prosecution must establish that appellant acted with malice. *Commonwealth v. MacArthur,* 427 Pa.Super. 409, 629 A.2d 166, 167 (1993).

■■■ The fact that James's body never was recovered does not preclude the government from proving that he is dead; proof of death may be established by circumstantial evidence. *Smith,* 523 Pa. at 586–88, 568 A.2d at 605. On appeal we review all of the circumstances to determine whether "an inference of death as a result of criminal agency is appropriate." *Id.*

James's disappearance occurred under suspicious circumstances. No one saw him in the parking lot or in the car and appellant appeared to claim he was missing even before he checked the car to see if the child was inside. Appellant went to the supermarket at an early hour despite the fact that Mother did not want him to purchase food for her. Appellant spent a very brief amount of time in the store before leaving without any groceries. He then approached the store employee. All of these rather curious circumstances allow an infer-

ence to be drawn that events did not occur as appellant claimed. Of even more significance were the days preceding James's disappearance, which proved quite odd. He was not seen awake or alert by any adult and remained in the sole care of appellant for most of the weekend. The last time he was seen awake was when he was standing on a crate in the couple's bedroom. Finally, appellant gave contradictory statements to police [1] and to volunteers who searched in vain for James.[2] All of these circumstances, in addition to appellant's statement in prison that police were not looking for the body in the "right place," support an inference that appellant was not telling the truth about James's disappearance. Appellant claims that James's disappearance was not unexplained or suspicious because he explained fully how and when the child disappeared. It is obvious, however, that the jury chose not to believe appellant's explanation.

We conclude that the evidence presented by the Commonwealth was sufficient to prove the death of James. *See Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552 (1963) (fact of death established where last time victim was seen was in the presence of the defendant in a helpless condition in circumstances that would indicate she was unconscious or incapable of moving herself). *See also Commonwealth v. Lettrich,* 346 Pa. 497, 31 A.2d 155 (1943) (evidence of corpus delicti sufficient where baby last seen alive with defendant, baby was unable to move on its own, and defendant made contradictory statements to police about the child's disappearance).

1. Appellant claimed that the reason he did not bring James into the store was because he was punishing the child for spilling milk and wetting the bed. Another time he told police that he did not bring the child into the store because James had no shoes on and appellant already had to carry his infant daughter.

2. At some point during the many searches for James, a volunteer told appellant that they planned to search the local dump. Appellant told the volunteer that he had already attempted to search the dump but that its owners would not give him permission to do so. Testimony from the dump's manager revealed that no requests to search were made by any party.

■ In order to prove that it was appellant who was responsible for James's death, the Commonwealth relied in part on the principle that where an adult has sole custody of a child for a period of time, and during that time the child suffers injury that is not accidental or self-inflicted, the jury is permitted to infer that the adult inflicted the injuries. *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837, 840 (1973). The evidence presented at trial clearly shows that whatever happened to James happened while he was in appellant's custody. The same circumstances which support the conclusion that James is dead, including appellant's story about how the child disappeared and his contradictory statements, invite the inference that James did not disappear on his own but was made to "disappear" by appellant himself.[3] *See Lettrich, supra.*

■ The final requirement is malice. To establish malice, the Commonwealth must show a "wickedness of disposition, hardness of the heart, cruelty, recklessness of consequences and a mind regardless of social duty." *Commonwealth v. Fierst*, 423 Pa.Super. 232, 620 A.2d 1196, 1203 (1993). Appellant insists that the evidence used to prove malice was 1) inadmissible, because it constituted prior bad acts and 2) insufficient, because it did not rise to the "magnitude of malice" necessary for a third degree murder conviction. A variety of witnesses, including Mother, James's grandparents, neighbors and a school teacher, testified about the range of physical and mental torture that James endured at the hands of appellant.

Specifically, the jury heard that appellant beat James on many occasions with various instruments including a crutch;

3. Our conclusion here also resolves another issue raised by appellant. At trial the Commonwealth introduced a statement made by appellant while in prison. Another inmate overheard appellant on the telephone saying: "[T]hey will never find the body. They haven't looked in the right place, down at the dump." Appellant claims that the Commonwealth did not establish James was dead or that appellant caused his death and, therefore, the corpus delicti was not established independent of appellant's admission. Our finding that the evidence was sufficient to prove James's death and that appellant caused the death disposes of this argument.

that appellant put vinegar and hot sauce in a soda can for James to drink and the child became sick therefrom; that appellant repeatedly made James stand on a crate for punishment; that one time James fell from the crate and loosened a tooth, so appellant took James to the bathroom, removed the loose tooth and made James return to the crate; that appellant beat James with a tree branch on a public street; that appellant once kicked James so hard in the back, he was propelled six to eight feet down a hallway until he hit a wall; that appellant smacked James in the head; that appellant would not permit James to sleep; that appellant forced James to stand in the corner when he was "bad," and on at least one occasion, the child was made to do so for over seven and one-half hours. All of this occurred as "punishment" for various breaches of conduct by this four year old boy.

In addition, a nurse testified that appellant threatened to "throw James in the trash" when he could not find someone to care for the boy while Johnson was giving birth to appellant's daughter. James's nursery school teacher testified that appellant came to school and gave her explicit permission to spank James.

■ Evidence of prior bad acts or the relationship between the accused and the victim is admissible to show malice. *See Commonwealth v. Albrecht,* 510 Pa. 603, 511 A.2d 764, 768 (1986) (Commonwealth's case against defendant based on showing numerous acts of violence between defendant and victim; defendant's intent to kill inferred from previous physical assaults and threats), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987); *Commonwealth v. Baker,* 466 Pa. 382, 353 A.2d 406, 411 (1976) (testimony which constituted instances of abuse in the chain of evidence produced by Commonwealth admissible to establish malice).

■ We decline appellant's invitation to view the evidence set out above as mere disciplinary actions on the part of appellant. The behavior of appellant toward this child crossed the line of discipline and clearly exhibited the malice necessary for third degree murder. Appellant's attempts to distinguish

this case, on the basis of severity, from other cases wherein we found that abuse suffered by the victim at the hands of the accused served to establish malice, fails. *See Commonwealth v. Matthews,* 480 Pa. 33, 389 A.2d 71 (1978) (victim had bruises all over his body); *Paquette, supra* (victim was beaten so brutally that his brain tissue was bruised). We disagree with appellant that the abuse James suffered was not "serious physical abuse." *See Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186 (1977) (testimony presented by Commonwealth describing a pattern of physical abuse admissible). The repeated, merciless destruction of this boy's physical and emotional self clearly was "serious" and also clearly established the requisite malice for third degree murder.

Our careful review of the record leads to the conclusion that the testimony regarding prior acts of abuse by appellant on the victim were admissible to prove malice, and further, that the evidence presented by the Commonwealth was sufficient to support appellant's conviction for third degree murder.

█ Appellant also claims that the trial court erred in allowing Mother to testify about appellant's abusive conduct toward her. This was the subject of a defense motion *in limine* wherein appellant asked the court to disallow any mention of the abuse in the Commonwealth's case-in-chief. The trial court granted the motion and the Commonwealth did not pursue the matter on direct examination of Mother. On cross-examination however, appellant questioned Mother about whether she ever abused James, attempting to raise an inference that she was the cause of the boy's death. In response, the Commonwealth elicited from Mother her reasons for hitting James, namely, that appellant would inflict abuse upon her if she did not punish James at his command. Appellant opened the door to such proper re-direct examination when he cross-examined Mother.

█ Finally, appellant claims that the admission of evidence of blood spots on the ceiling in the apartment was error. The testimony was that when Mother returned from the hospital after giving birth to her daughter, Mother noticed red

spots on the ceiling and wall. She asked appellant, who had been caring for James during her absence, about the spots. He explained that they were juice stains. An analysis performed by police indicated that the spots were human blood. The Commonwealth introduced the test results to show that appellant had beaten James severely in the past, thereby showing malice, and lied about the origin of the spots, thereby showing consciousness of guilt and an effort to deceive. Appellant claims that the presence of the blood spots was irrelevant to the case because it did not occur during the weekend at issue.

We agree with the trial court that the blood spots were admissible to establish the Commonwealth's case of a continuing pattern of violence by appellant against James. The presence of the blood, and appellant's lie about its origin, make it more likely than not that appellant abused James. The spots corroborated Mother's testimony that appellant often beat James until he bled and, therefore, support the Commonwealth's proof of malice.

Judgment of sentence affirmed.