J-E01001-19

2019 PA Super 293

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
CARLOS PEREZ : No. 1392 EDA 2017

Appeal from the Order April 5, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): MC-51-CR-0005268-2017

BEFORE: PANELLA, P.J., BENDER, P.J.E., GANTMAN, P.J.E., LAZARUS, J.,
OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., and
McLAUGHLIN, J.

CONCURRING AND DISSENTING OPINION BY OLSON, J.:

**FILED SEPTEMBER 30, 2019**

I agree with the learned majority that the order of the Court of Common

Pleas of Philadelphia County that dismissed charges of first-degree murder

and possession of an instrument of crime ("PIC") filed against Appellant is a

final order. Thus, like my colleagues, I find that we have jurisdiction to hear

this appeal. I part company with the learned majority, however, as to whether

the Commonwealth met its burden of establishing a *prima facie* case of murder

against Appellant.[1] In my view, the record in this case, when viewed in the

---

[1] As noted by the majority, the Commonwealth asserted in its Pa.R.A.P.
1925(b) concise statement of errors complained of on appeal and in the
statement of questions presented section of its brief that the lower court erred
in finding that the Commonwealth failed to establish a *prima facie* case "of
murder and related offenses." However, the Commonwealth failed to include

proper light, supports a finding that the elements of murder were established, and there is probable cause to believe that Appellant was the person who committed these crimes. Accordingly, I believe that the lower court erred in dismissing the murder charge against Appellant.

As the majority states, "[t]he purpose of a preliminary hearing is to determine whether the Commonwealth has made out a *prima facie* case for the offenses charged." Majority Opinion at *10, *quoting* **Commonwealth v. Ouch**, 199 A.3d 918, 923 (Pa. Super. 2018); **See also Commonwealth v. Landis**, 48 A.3d 432, 444 (Pa. Super. 2012) (*en banc*) ("It is well-settled that the preliminary hearing serves a limited function. The purpose of a preliminary hearing is to avoid the incarceration or trial of a defendant unless there is sufficient evidence to establish a crime was committed and the probability the defendant could be connected with the crimes") (quotations and citations omitted). Moreover, "[a] *prima facie* case consists of evidence, **read in the light most favorable to the Commonwealth**, that sufficiently establishes both the commission of the crime and that the accused is **probably** the perpetrator of that crime." **Ouch**, 199 A.3d at 923 (emphasis added) (quotations and citations omitted). In addition to viewing the evidence in the light most favorable to the Commonwealth, "we are to consider all

---

any argument regarding the PIC charge in its brief. Thus, the only issue the Commonwealth preserved is whether it met its burden of establishing a *prima facie* case for murder against Appellant. **See Commonwealth v. Spotz**, 716 A.2d 580, 585 n. 5 (Pa. 1999) ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in [its] brief").

reasonable inferences based on that evidence which could support a guilty verdict. The standard clearly does not require that the Commonwealth prove the accused's guilt beyond a reasonable doubt at this stage." *Landis*, 48 A.3d at 444 (quotations and citations omitted). Critically, "[t]he preliminary hearing is not a trial." *Commonwealth v. Hilliard*, 172 A.3d 5, 10 (Pa. Super. 2017) (quotations and citations omitted). Instead, "the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury." *Id.* (quotations and citations omitted). Additionally, the weight of the evidence and credibility are not factors at the preliminary hearing stage. *Id.*

In applying these legal standards to the evidence presented in this case, I conclude that the Commonwealth met its burden of establishing a *prima facie* case against Appellant for the charge of murder.

As noted by the learned majority, there is no dispute, for purposes of the preliminary hearing, that Andrew Hazelton, the victim, was unlawfully killed by a stab wound to his neck. Majority Opinion at *13. Thus, the elements for murder were established by the Commonwealth. "The sole issue before this Court, therefore, is whether the evidence, read in the light most favorable to the Commonwealth shows that [Appellant] is probably the perpetrator of [the] crime." *Id.* (quotations and citations omitted).

During the two preliminary hearings, the following evidence was elicited.

Hazelton, and his friend, Hector Martinez, went to the Bleu Martini nightclub shortly before closing on August 20, 2016. N.T. First Preliminary

Hearing, 3/22/17, at 4. After paying at the door, they entered the club. *Id.* at 5. Martinez began talking to a female friend of his and Hazelton started dancing with a girl who Martinez did not know. *Id.* at 6. Appellant, who was wearing a grey shirt, was sitting at a table nearby. *Id.* at 7-8. The area in which the individuals were located was "a small confined area." *Id.* at 8. According to Martinez, the following occurred:

A.: I saw the guy with the beard getting out of the table.

Q.: You are pointing to [Appellant]?

A.: Yes.

Q.: What did he do?

A: I saw him getting out of the table and the next thing you know two bouncers went to the left side of me towards the group of people.

Q.: [Appellant] got up from the table?

A.: Yes.

Q.: And where did [Appellant] go?

A.: He started walking towards the group of people.

. . .

Q.: Was Mr. Hazelton in that group of people?

A: Yes.

Q.: And what did you see next?

A.: I just saw the two bouncers walk straight to my left side, both of them are big guys. And I saw my friend [Hazelton] come to the side holding his neck.

*Id.* at 8-9.[2] Hazelton exited the club and Martinez followed him at which time Martinez saw that "blood [was] gushing out of [Hazelton's] neck." *Id.* at 10. Martinez turned to go back into the club when he saw Appellant exiting. Martinez asked Appellant "[w]hat did you do to my friend?" and then punched him, at which time Appellant ran back into the club. *Id.* According to Martinez, Appellant's shirt "was full of blood."[3] Martinez testified that no other man besides Appellant was near Hazelton when he was stabbed. *Id.* at 24 and 25.

_____

[2] At the first preliminary hearing, the Commonwealth introduced the written statement that Martinez gave to the police on September 29, 2016. N.T. First Preliminary Hearing, 3/22/17, at Commonwealth Exhibit C-2. Martinez was asked during the first preliminary hearing to confirm the statements given on September 29, 2016. Martinez confirmed that the statements contained in the September 29, 2016 written statement were true and correct. *Id.* at 16. In that statement, Martinez stated as follows:

> As I was standing there, I seen some other girl dancing at a table that was next to where [Hazelton] was standing. There was a guy sitting at the table where the girl was dancing and the guy started to get up out of the table to stand up. When the guy stood up from the table, he started to walk towards where [Hazelton] was at, but two bouncers went by me real fast and the bouncers broke up the commotion.

*Id.* at Commonwealth Exhibit C-2. *See also id.* at 18-19. During the first preliminary hearing, Martinez identified the "guy" as Appellant. *Id.* at 19.

[3] According to the DNA lab results, the blood on Appellant's shirt was Hazelton's. N.T. First Preliminary Hearing, 3/22/17, at Commonwealth Exhibit C-6.

At the second preliminary hearing, Marquis McNair testified. McNair was working security for Bleu Martini on the night of August 20, 2016. N.T. Second Preliminary Hearing, 4/5/17, at 22. McNair testified that he was stationed inside the front door of the bar at approximately 1:50 a.m. *Id.* At that time, "two groups . . . got into [] a push[ing] match, a little disagreement thing." *Id.* at 23. Specifically, the pushing match was between a black male (Hazelton) and a Spanish male (Appellant). *Id.* at 27. McNair testified as follows:

> Q.: Sir, the pushing match, the shoving match between the black male, he was the male that eventually got stabbed?
>
> A.: Yes.
>
> Q.: And the Spanish male, do you remember what the Spanish male was wearing, just in terms of the clothing; do you remember? Start with the shirt, do you remember anything about his shirt?
>
> A.: Yeah, it was basically like a regular shirt, basically like, like . . .
>
> Q.: Color?
>
> A.: Like grey, I think, yeah, grey, basically.
>
> Q.: Okay. So when you saw this shoving match between the black male and the Spanish male that was wearing a grey shirt, what did you do?
>
> A.: We separated it. And they both said, oh, yeah, we're cool, we're cool. So me and my other security guy, we posted up right there.

*Id.* at 31-32. McNair continued his testimony as follows:

> Q.: So tell us what happened next, sir.

- 6 -

A.: After we broke up the push match the first time and stuff, we posted right there by the door. And probably like a couple minutes later, the black guy and the Spanish guy was at it again.

Q.: Same two individuals?

A.: Yes.

Q.: The black male that eventually got stabbed –-

A.: Yes.

Q.: -- and the Spanish guy that was wearing the grey T-shirt?

A.: Yes.

Q.: What did you see?

A.: Basically, basically a second pushing match, but we went in there and broke it up, basically.

Q.: And what happened at that point?

A.: At that point I was in the middle. Mac[, the other security guard on duty], took other people towards the door basically, and a girl basically screamed like, they cut him.

Q.: Okay. Who was she referring to, could you see?

A.: The black male.

Q.: The black male?

A.: Yeah, the black male.

Q.: That was fighting with the Spanish male?

A.: Yes.

Q.: What did you observe about the black male that was fighting with the Spanish male at that time?

A.: At first, first, I didn't think nothing of it. I thought he just got punched in the face and then he took his hand off his neck and blood was just gushing out.

*Id.* at 34-35. McNair confirmed that Appellant and Hazelton were the only two people involved in the pushing or shoving matches. *Id.* at 46, 54 and 56.

In describing the second pushing match between Appellant and Hazelton, McNair testified that the second pushing match "was worse than the first pushing match." *Id.* at 62-63.[4] He described the second encounter as follows:

Q.: Sir, I am going to ask you some questions about the second shoving match. You said it was a little more -- what was the word you used?

A.: A little bit more aggressive than the first one.

Q.: Can you describe that for us?

A.: Basically, they was coming at each other, but it was like more intense than the first one. Because the first one we was able just to, all right, all right, all right, guys, all right, and they was like, oh, no, we're cool, we're cool, basically. Then the second one was like we had to basically like pry them apart.

Q.: Okay. When they were coming at each other the second time, that second time, was the Spanish male coming at [Hazelton] in the area where his neck would have been?

A.: Yeah, it was like this, with the arm movement.

_____

[4] From the transcript, it is apparent that McNair demonstrated in some form the manner in which Appellant and Hazelton were pushing during the second encounter, specifically the motion of their arms. N.T. Second Preliminary Hearing, 4/5/17, at 64.

Q.: Okay. At that point in time when the Spanish male was coming at the black male's neck area, would you have been able to see if there was anything in his hand, if there was?

A.: No.

Q.: Why not?

A.: Because they were moving.

Q.: Okay. And it was right in his neck area; right?

A.: Yeah, basically.

. . .

Q.: All right. So at that point in time, the second match, now, they're coming in, it's a little more aggressive, the Spanish male is coming at the black male's neck area as you described, and then you separate them; right?

A.: Yes.

Q.: And then how soon thereafter does the female shout or say, they stabbed him, or whatever the words you used?

A.: They cut him, basically she said, they cut him.

Q.: How soon thereafter had she said that?

A.: Like I want to say probably like a couple of seconds.

Q.: Was there anymore, did anybody else did you see at that point go after the black male in terms of a fight, scuffle, push match, anything like that?

A.: No.

Q.: All right. So you separate them and then you hear the female say, they cut him?

A.: They cut him.

Q.:    And then you looked at the black male, and what did you notice at that point?

A.:    He was basically holding his neck.

*Id.* at 75-78.

Following the stabbing, McNair helped to remove everyone from the club. At that time, he saw Appellant wearing just a tank top. *Id.* at 37. The club rule is that everyone must wear a shirt; therefore, McNair asked Appellant where his shirt was. Appellant told McNair that it was in the bathroom because it got bloody from the fight. *Id.* at 37, 39 and 44. McNair took Appellant into the bathroom at which time Appellant "fish[ed] for his shirt in the trash bin." *Id.* at 40. Appellant put the shirt over his shoulder as they left the bathroom. *Id.* It was the same grey shirt that Appellant had been wearing earlier. *Id.*

Philadelphia Police Officer Charles Stone also testified at the second preliminary hearing. Officer Stone was working in the area of the Bleu Martini when he was flagged down by an individual who said that there had been a fight nearby and someone was outside on the ground. *Id.* at 85. While walking to the location, Officer Stone received a radio call about the stabbing. *Id.* Upon arrival, Officer Stone talked with staff, security and management of the Bleu Martini. He was told that Appellant had been involved in the fight. *Id.* at 104. Officer Stone entered the club and approached Appellant who was sitting at a booth in the bar. *Id.* at 89. Appellant was seated in the booth by himself "but security was there at the time." *Id.* at 92. Officer Stone believed that security was there because Appellant was involved in the fight

and because he owed money on his tab. *Id.* at 92 and 104.[5] When asked if

he had been involved in the fight, Appellant originally denied it, but then later

_____

[5] The majority concludes that Appellant was compliant at all times and states that Bleu Martini's security staff detained Appellant "because of the $600 he owed on his tab, not because they thought he was involved in stabbing Hazelton." Majority Opinion at 17-18. In reaching this conclusion, the majority ignores the following testimony of Officer Stone:

> Q.:  Before you interacted with [Appellant], when you walked into the Bleu Martini and [Appellant] was seated at that booth, was there anyone around him?
>
> A.:  No, he was by himself, but security was there at the time.
>
> Q.:  And do you know why the security was there?
>
> A.:  He owed money on the tab, I believe.
>
> . . .
>
> Q.:  Just to be clear, officer, you did talk to people in the bar; right?
>
> A.:  Correct.
>
> Q.:  Staff, security, manager?
>
> A.:  Right.
>
> Q.:  **Did they tell you who was involved in the fight?**
>
> A.:  **Yes.**
>
> Q.:  **Who was involved in the fight?**
>
> A.:  **They showed me to [Appellant].**
>
> Q.:  **It wasn't just the bar tab?**

said that he was hit but that "he wasn't involved in the fight." *Id.* at 90. Officer Stone was familiar with the Bleu Martini's dress code and he noticed that Appellant was only wearing a tank top; therefore, Officer Stone asked Appellant where his shirt was. Appellant retrieved the shirt which had been tucked in a corner behind the seat where he was sitting. *Id.* at 90-91. The shirt had blood on it. *Id.* at 91.

When looking at this evidence and all reasonable inferences that may be drawn therefrom, in a light most favorable to the Commonwealth, I conclude that the Commonwealth met its burden of establishing a *prima facie* case against Appellant for murder. More specifically, under our standard of review, the Commonwealth's evidence demonstrates that Appellant "is **probably** the perpetrator of [the] crime." *Ouch*, 199 A.3d at 923 (emphasis added).

As the evidence reflects, Hazelton was dancing with a girl in the Bleu Martini when Appellant got up from a nearby table and approached Hazelton. Appellant and Hazelton engaged in a pushing match which was broken up by two members of the club's security. Shortly thereafter, Appellant and Hazelton became engaged in a second, more "aggressive" altercation that

---

A.:   **No, they said he was part of the fight.**

N.T. Second Preliminary Hearing, 4/5/17, at 92 and 104 (emphasis added).

required the two security guards to physically get between Appellant and Hazelton and pry them apart. No one other than Appellant and Hazelton was involved in these two physical altercations. During the second altercation, Appellant made a motion toward Hazelton's neck just before the two were separated.[6] Within seconds, a female yelled that Hazelton was cut and Hazelton was holding his neck which was bleeding. Appellant exited the club wearing a shirt stained with Hazelton's blood.[7] It was not until Hazelton's friend, Martinez, punched Appellant that Appellant ran back into the club.[8]

_____

[6] The learned majority relies on the fact that no one testified that they saw a weapon in Appellant's hand or that they heard glass break. Majority Opinion at *15. It is true that no one testified to seeing a weapon or hearing glass break. However, I do not believe that this fact supports the conclusion that Appellant was not the perpetrator. Instead, the evidence established that it was extremely dark and loud in the club (N.T. First Preliminary Hearing, 3/22/17, at 30-31); hence, a reasonable inference may be drawn that Appellant did have some type of weapon on him at the time of the second altercation with Hazelton, however, the conditions of the club made it difficult for persons to see.

[7] At the second preliminary hearing, the Commonwealth introduced two photographs of the grey shirt that Appellant was wearing the night of August 20, 2016. N.T. Second Preliminary Hearing, 4/5/17, at Commonwealth Exhibit C-3. In reviewing these photographs, it is apparent that a significant amount of blood was on the front and back of the shirt. Clearly, Appellant was in very close proximity to Hazelton when he was bleeding from his neck. A reasonable inference that may be drawn from this evidence is that Appellant was the person that stabbed Hazelton in the neck.

[8] The learned majority references the fact that Appellant went back into the club after being hit by Martinez and concludes that "the record shows [Appellant] stayed at Bleu Martini's premises and cooperated with bar security and police." Majority Opinion at *17. In fact, throughout its opinion, the majority relies extensively on its conclusion that Appellant was cooperative

- 13 -

Upon reentering the club, Appellant removed his bloody shirt and threw it in the trash bin in the restroom. After retrieving the shirt from the trash at the direction of McNair, Appellant tucked the shirt in the corner of the booth where he was sitting.[9] All of these facts viewed in a light most favorable to the Commonwealth (Appellant and Hazelton were engaged in two pushing matches, the second of which was more aggressive; Appellant and Hazelton were the only two individuals involved in these altercations; Appellant made a motion toward Hazelton's neck seconds before a female yelled that Hazelton had been cut; Appellant exited from the club but returned only after being punched by Martinez; Appellant hid his shirt which contained a significant amount of Hazelton's blood; Appellant denied being involved in a fight) and all reasonable inferences therefrom, clearly establish that the Commonwealth met its burden of establishing a *prima facie* case that Appellant was **probably**

_____

and compliant at all times. I believe that this conclusion may only be reached if one were to look at the facts, and reasonable inferences drawn therefrom, in a light most favorable to Appellant. In looking at this fact in a light most favorable to the Commonwealth (which is the standard we must apply), a reasonable inference is that Appellant was fleeing the club immediately after the stabbing and only returned inside because he was physically accosted by Martinez who was standing outside of the club. *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1078 (Pa. 2001) (fleeing scene of a crime can demonstrate consciousness of guilt).

[9] In considering these facts in a light most favorable to the Commonwealth, a reasonable inference may be drawn that Appellant removed, discarded and hid the bloody shirt in an effort to conceal evidence. *Commonwealth v. Dolman*, 541 A.2d 319, 322 (Pa. 1988) (concealing evidence can prove accused's intent or state of mind).

the perpetrator of the crime of murder.  ***Ouch***, 199 A.3d at 923 ("[a] *prima facie* case consists of evidence, **read in the light most favorable to the Commonwealth**, that sufficiently establishes both the commission of a crime and that the accused is **probably** the perpetrator of that crime") (emphasis added) (quotations and citations omitted). Accordingly, I must respectfully dissent.

President Judge Emeritus Bender, Judge Kunselman and Judge McLaughlin join this Concurring and Dissenting Opinion.