J-E01001-19

2019 PA Super 300

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLOS PEREZ | : | No. 1392 EDA 2017 |

Appeal from the Order April 5, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): MC-51-CR-0005268-2017

BEFORE: PANELLA, P.J., BENDER, P.J.E., GANTMAN, P.J.E., LAZARUS, J., OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., and McLAUGHLIN, J.

OPINION BY LAZARUS, J.:                    **FILED OCTOBER 07, 2019**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Philadelphia County, dismissing charges of first-degree murder[1] and possession of an instrument of crime ("PIC")[2] against

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] The Commonwealth, in its Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, raised the issue, whether "the lower court erred in holding that evidence indicating the defendant fatally stabbed the victim was insufficient for a *prima facie* case of murder and related offenses." Pa.R.A.P. 1925(b) Statement, 4/25/17, at 1. The Commonwealth, however, failed to include any argument relevant to the dismissal of Perez's PIC charge in its brief to a panel of this Court or in its substituted brief before this Court en banc. Accordingly, we consider any claim related to Perez's PIC charge abandoned on appeal. ***See Commonwealth v. Rodgers***, 604 A.2d 1228, 1239 (Pa. Super. 1992) ("We must deem an issue abandoned where it has been identified on appeal but not properly developed in the appellant's brief.").

Carlos Perez after a second preliminary hearing. After careful review, we affirm.

At approximately 1:00 a.m. on August 21, 2016, Andrew Hazelton and Hector Martinez went to Bleu Martini, a bar in Philadelphia. N.T. First Preliminary Hearing, 3/22/17, at 4–5. They made their way to "a small[,] confined area" where the two men split from one another. *Id.* at 5–8. Martinez talked to a friend, while Hazelton danced with a woman "five to eight" feet from Martinez. *Id.* at 5–7. Perez, already at Bleu Martini, was seated at a table approximately four feet from where Hazelton was dancing. *Id.* at 8. At approximately 1:50 a.m, Marquis McNair, a bouncer at Bleu Martini, spotted Hazelton and Perez pushing one another. N.T. Second Preliminary Hearing, 4/5/17, at 22–27. The two men were shoving one another in the center of two groups, comprised of between five and fifteen people each, when McNair stepped in and separated them. *Id.* at 27, 54–55. Hazelton told McNair that he and Perez knew one another and that everything was "cool." *Id.* at 59. McNair did not see any weapons or broken bottles following this initial altercation. *Id.* at 61. McNair and a second bouncer continued to monitor the area, standing approximately ten to fifteen feet from Hazelton and Perez. *Id.* at 32.

A few minutes later, Hazelton and Perez began shoving one another again. *Id.* at 34. McNair saw Perez and Hazelton pushing one another, and witnessed Perez make an "arm movement" towards Hazelton's neck, but he

- 2 -

neither saw Perez stab Hazelton, nor observed a weapon of any kind in Perez's hands. *Id.* at 62–64, 76. However, when McNair and his colleague stepped in to break up the second shoving match, he heard a woman exclaim, "they cut him[.]" *Id.* at 35, 48. McNair then noticed Hazelton holding his neck. *Id.* at 66, 77–78. When Hazelton removed his hand from his neck, blood began "gushing out[.]" *Id.* at 35.

Martinez only noticed something amiss when the two bouncers moved to separate Hazelton and Perez. N.T. First Preliminary Hearing, 3/22/17, at 9, 33–34. When Martinez saw Hazelton emerge from the crowd holding his neck, he followed Hazelton outside. *Id.* Hazelton tried to speak, but was unable to do so, due to the severity of his wound. *Id.* at 10. Martinez applied pressure to Hazelton's neck in an attempt to stanch the bleeding. *Id.* at 34–35. Shortly thereafter, Martinez saw Perez exit Bleu Martini. *Id.* at 35. Martinez, who assumed Perez played a role in Hazelton's injury because of the blood on Perez's shirt, punched Perez in the face. *Id.* at 11, 35. Perez went **back** into Bleu Martini. *Id.* at 11.

McNair began clearing patrons out of the club shortly after separating Perez and Hazelton because it was nearing Bleu Martini's 2:00 a.m. closing time. N.T. Second Preliminary Hearing, 4/5/17, at 36. He encountered Perez walking around the club in a tank top, and asked Perez why he was not wearing a shirt, as doing so violated Bleu Martini's dress code. *Id.* at 36–37. Perez told McNair he took his shirt off and threw it in the bathroom trashcan

- 3 -

after it got covered with blood. *Id.* at 39–40. McNair then escorted Perez to the bathroom to retrieve the shirt. *Id.* at 39–40. Perez stayed at the bar under the supervision of Bleu Martini security, not in connection with the killing, but because of the $600 he owed on his bar tab. *Id.* at 92, 100.

At approximately 2:00 a.m., a pedestrian on Second Street alerted Philadelphia Police Officer Charles Stone to the stabbing. *Id.* at 85. Upon entering Bleu Martini, the staff directed Officer Stone towards Perez, who was seated alone in a booth. *Id.* at 86–88. Perez initially denied any involvement in the fight. *Id.* at 90–92. When Officer Stone asked why he was not wearing a shirt, Perez retrieved his bloody shirt from under the booth. *Id.* When Officer Stone asked how he got blood on his shirt, Perez said he got hit. *Id.* at 92. Officer Stone consulted with detectives, who ordered Perez be brought to the police station. *Id.* The police were unable to find the weapon used to cut Hazelton's throat. *Id.* at 103.

Hazelton died at the hospital later that day. N.T. First Preliminary Hearing, 3/22/17, at 37. The medical examiner's office determined Hazelton's death resulted from the stab wound he sustained to his neck, which severed his jugular vein and trachea. *Id.* at 37. On February 23, 2017, police arrested Perez in connection with Hazelton's death, and on February 24, 2017, Perez was arraigned on charges of first-degree murder and PIC.

On March 22, 2017, the Commonwealth presented its case to Philadelphia Municipal Court Judge Thomas Gehret. In addition to Martinez's

testimony, the Commonwealth moved the following exhibits into evidence: Martinez's August 21, 2016 statement to police (C-1); Martinez's September 29, 2016 statement to police (C-2); a photo array shown to Martinez during his second statement to police (C-3); the medical examiner's report stating Hazelton's cause of death as a stab wound sustained to neck (C-4); a trace laboratory report of Perez's shirt (C-5); and a DNA laboratory report indicating the blood found on Perez's shirt belonged to Hazelton (C-6). At the conclusion of the hearing, Judge Gehret dismissed Perez's charges for lack of evidence. The Commonwealth refiled charges later that day.

Perez was subsequently brought before the Court of Common Pleas, the Honorable Kathryn Streeter Lewis presiding, where, in addition to McNair's and Officer Stone's testimony, the Commonwealth introduced the following exhibits into evidence: a picture of Bleu Martini's interior (C-1); McNair's statement to police from February 8, 2017 (C-2); pictures of Perez's bloody shirt (C-3); and the statement of Officer Stone from August 22, 2017 (C-4). Judge Lewis dismissed the charges against Perez on the grounds that "the Commonwealth was unable to prove at a *prima facie* level that it was [Perez] who stabbed and killed [Hazelton]." Pa.R.A.P. 1925(a) Opinion, 7/28/17, at 9.

The Commonwealth timely appealed and a divided three-judge panel of this Court quashed its appeal as interlocutory. On June 18, 2018, the Commonwealth filed a petition for reargument en banc. On August 8, 2018,

- 5 -

we withdrew our previous panel decision and granted the Commonwealth's petition.

The Commonwealth raises the following questions for our review:

1) Whether the Commonwealth's appeal is from an interlocutory order or a final order, after the Philadelphia trial court twice concluded that the Commonwealth failed to establish a *prima facie* case of the charges against [Perez] and dismissed the charges.

2) Properly viewed in the light most favorable to the Commonwealth, did the evidence and all reasonable inferences therefrom establish a *prima facie* case of murder and related offenses, where [Perez] provoked two altercations with the victim moments before he was fatally stabbed in the neck, and then tried to flee the scene, conceal evidence, and lie to police about his involvement?

Brief of Appellant, at 4.

In its first argument, the Commonwealth asserts that Philadelphia Local Rule of Criminal Procedure 520(H)[3] renders Judge Lewis' order dismissing charges against Perez final, rather than interlocutory.

As a general rule, subject to certain exceptions not presently at issue,[4] this Court's jurisdiction is limited to appeals from final orders. ***See***

_____

[3] Philadelphia Criminal Rule 500 was renumbered Rule 520 effective July 21, 2014. ***See*** Phil.Crim.R. 520(H).

[4] The Commonwealth seeks to establish jurisdiction under Pa.R.A.P. 341, governing final orders, not Pa.R.A.P. 311(d), which sets forth the right to an interlocutory appeal where the Commonwealth certifies in its notice of appeal that an order terminates or substantially handicaps the prosecution. ***See*** Brief of Appellant, at 1; ***see also Commonwealth v. Malinowski***, 671 A.2d 674, 678 (Pa. Super. 1996) (finding Commonwealth's failure to certify ruling terminated or substantially handicapped prosecution rendered Superior Court without jurisdiction to hear otherwise valid interlocutory appeal as of right).

*Commonwealth v. Scarborough*, 64 A.3d 602, 607 (Pa. 2013) ("As a general rule . . . appellate courts only have jurisdiction over appeals taken from a final order."). Our courts have long held "[a] finding by a committing magistrate that the Commonwealth has failed to establish a *prima facie* case is not a final determination, such as an acquittal, and only entitles the accused to his liberty for the present, leaving him subject to re[-]arrest." *Commonwealth v. Hetherington*, 331 A.3d 205, 208 (Pa. 1975); *cf. Commonwealth v. Thorpe*, 701 A.3d 488, 490 (Pa. 1997) (allowing Commonwealth's appeal after third preliminary hearing, as subsequent re-arrest would be prohibited by due process).

Ordinarily, following the failure to present a *prima facie* case, "if the [C]ommonwealth deems itself aggrieved by [the magistrate's] decision[,] it may bring the matter again before any *other* officer empowered to hold preliminary hearings." *Hetherington*, *supra* at 208 (emphasis added). However, our Supreme Court found the *Hetherington* logic inapplicable to the dismissal of homicide charges in Philadelphia County, owing to Philadelphia Local Criminal Rules 520(H) and 605. *See Commonwealth v. Prado*, 393 A.2d 8, 9–10 (Pa. 1978) ("As a result [of Rules 520(H) and 605] the *Hetherington* approach of seeking a review by another judicial officer is not available in Philadelphia.") (quotation omitted).

Rule 520(H) reads, in relevant part, as follows:

**520(H) Appeal by Way of Re-Arrest.**

When a re-arrest is taken in the nature of an appeal by the Commonwealth from an earlier dismissal, the Judge assigned to the Common Pleas Court Motion Court shall hold the Preliminary Arraignment. The Preliminary Hearing shall likewise be scheduled in the Common Pleas Court Motions Court, within three to ten days after preliminary arraignment.

Phil.Crim.R. 520(H).

Rule 605 provides, in relevant part, as follows:

**Rule 605 Motions Court/Criminal Calendar Program and Homicide Cases.**

All Pretrial Motions Applicable to cases in the Criminal Calendar Program or Homicide Program will be scheduled by the applicable Calendar Judge and heard by the Motions Court Judge assigned to that program.[5]

Phil.Crim.R. 605.

"Under Philadelphia Criminal Rules [520](H) and 605, therefore, only the assigned Motions Court Judge may review a request for re[-]arrest in a homicide case." ***Prado***, ***supra*** at 10. Orders dismissing homicide charges following re-arrest are, therefore, deemed final in the context of Rules 520(H) and 605, as the "prosecution is effectively barred from re[-]arresting [an appellant] because of the provisions of the Philadelphia Criminal Rules that only the assigned Motions Court Judge may review such a request." ***Prado***,

---

[5] When evaluated in ***Prado***, Rule 605 featured slightly different wording, which stated, in relevant part, "the Felony Jury or Homicide Program[;]" the current iteration states, "Criminal Calendar Program or Homicide Program." ***Prado***, ***supra*** at 10; ***and*** Phil.Crim.R. 605. All other relevant text remains the same. ***Id.***

*supra* at 10; *see also Commonwealth v. Weigle*, 997 A.2d 306, 308 n.5 (Pa. 2000) ("under Philadelphia County Local Criminal Rule [520](H), Common Pleas Motions Court judges' orders discharging an accused or denying a re[-]arrest petition constitute final orders subject to appellate review.").[6]

The instant order, issued by the Philadelphia Court of Common Pleas Motions Court, dismissed homicide charges against Perez following his re-arrest and a second preliminary hearing. N.T. Second Preliminary Hearing, 4/5/17, at 115. In light of our Supreme Court's holding in *Prado*, establishing the preclusive effect of Rules 520(H) and 605 on the Commonwealth's ability to seek review by another judge following the dismissal of homicide charges

_____

[6] Though the *Weigle* Court's pronouncement concerning the effect of Rule 520(H) on the finality of an order is instructive, it is also *dictum*. *See in re L.J.* 79 A.3d 1073, 1081 (Pa. 2013) (noting where Pennsylvania Supreme Court "simply volunteered the discussion [and] the issue was not litigated by the parties . . . the statement was non-binding *dicta* and *stare decisis* [did] not apply."); *see also Weigle*, *supra* at 308 (offering footnote 5 to explain statement that "the Commonwealth *could have* appealed the dismissal of the robbery charges, *but it did not do so*.") (emphasis added). *Prado* is, therefore, the only binding case law concerning the relationship between Rule 520(H) and finality. *Prado*, *supra* at 10. We note, though *Prado* proceeded from a distinct procedural posture, wherein the Commonwealth appealed after the court dismissed *a petition for re-arrest* following a second preliminary hearing, its holding controls the instant case; the *Prado* court found "the court's orders discharging the appellee and refusing the prosecution's petition for re[-]arrest *are final orders* subject to appellate review." *Id.* (emphasis added). Our Supreme Court's use of the plural indicates, in the context of Rule 520(H), both orders dismissing charges *and* those denying re-arrest are final. *Id.*

from Motions Court, we find Judge Lewis' dismissal of charges against Perez constitutes a final order subject to review by this Court. *Prado*, *supra* at 10.

Finding that this Court has jurisdiction over the instant matter, we proceed to consider whether the evidence presented at Perez's hearing was sufficient to establish a *prima facie* case of first-degree murder. Brief of Appellant, at 1.

The evidentiary sufficiency of the Commonwealth's case, or lack thereof, is a question of law; as such, our scope of review is plenary. *Commonwealth v. Karetny*, 880 A.2d 505, 528 (Pa. 2005). We have previously described the well-settled principles governing preliminary hearings, as well as the Commonwealth's concomitant burden, as follows:

> The purpose of a preliminary hearing is to determine whether the Commonwealth has made out a *prima facie* case for the offenses charged. A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and **that the accused is probably the perpetrator of that crime**.[7]

_____

[7] Perez contends he—not the Commonwealth—is owed all reasonable inferences. *See* Brief of Appellee, at 10–11 ("[T]he Commonwealth is <u>not</u> . . . entitled to have the facts viewed by this Court in a light most favorable to <u>them</u> [sic] . . . if any reasonable inferences are due, they should be made in a light most favorable to <u>Appellee</u> and not the Commonwealth.") (emphasis in original). In doing so, Perez plainly misunderstands both the definition and the purpose of a preliminary hearing—a hearing designed to prevent "a person from being imprisoned . . . for a crime with which there is no evidence of his connection"—which is "not a trial in any sense of the word." *Commonwealth ex rel. Maisenhelder v. Rundle*, 198 A.2d 565, 567 (Pa. 1964); *see Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005) ("[T]he evidence *must* be considered in the light most favorable to the Commonwealth so that inferences that would support a guilty verdict are given effect.") (emphasis

. . .

> The Commonwealth establishes a *prima facie* case when it produces evidence[] that, if accepted as true, would warrant the trial judge to allow the case to go to a jury. The Commonwealth need not prove the elements of the crime beyond a reasonable doubt; rather, the *prima facie* standard requires evidence of the existence of each and every element of the crime charged. Moreover, the weight and credibility of the evidence are not factors at this stage, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense.

***Commonwealth v. Ouch***, 199 A.3d 918, 923 (Pa. Super. 2018) (emphasis added) (internal citations and quotations omitted).

At the *prima facie* level, "*[i]nferences reasonably drawn* from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." ***Id.*** (emphasis added). Though a judge presiding over a preliminary hearing necessarily views the evidence through a sharply different lens than her counterpart at trial, the standard by which we assess the permissibility of evidentiary inferences remains consistent at both stages: "Evidentiary inferences, like criminal presumptions, are constitutionally infirm unless the inferred fact is more likely than not to flow from the proved fact on

---

added). It is not for this Court to revisit longstanding pillars of criminal jurisprudence. ***See Commonwealth v. Montini***, 712 A.2d 761, 769 (Pa. Super. 1998) (Johnson, J. Concurring) ("The Superior Court is an error[-]correcting court and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania.").

which it is made to depend." **_See Commonwealth v. McBride_**, 595 A.2d 589, 591 (Pa. 1991) (finding quantum of evidence sufficient to require defendant stand trial for criminal trespass).

In the instant case, it is therefore the Commonwealth's burden to establish support—either by direct evidence or inferences *reasonably* drawn therefrom—for the existence of each element of first-degree murder, as well as probable cause to believe Perez committed the offense. **_Ouch_**, **_supra_** at 923; **_McBride_**, **_supra_** at 591.

Murder is defined, in relevant part, as follows:

**§ 2502. Murder**

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

. . . .

**"Intentional killing."**  Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S.A. § 2502(a), (d)

"It is well-established that to convict a defendant of first-degree murder, the Commonwealth must show that the defendant killed another person with the specific intent to kill that person and malice aforethought." **_Commonwealth v. Santos_**, 876 A.2d 360, 363 (Pa. 2005).  "Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." **_Commonwealth v. Mattison_**, 82 A.3d 386, 392 (Pa. 2013).

Neither the parties involved nor the court below dispute that, for purposes of a preliminary hearing, the circumstances surrounding Hazelton's death make out the elements of first-degree murder. ***See*** Brief of Appellant, at 19 ("The preliminary hearing court concluded that the Commonwealth satisfied the [elements of first-degree murder in] its *prima facie* case because the evidence showed that the victim was unlawfully killed by a stab wound to the neck."); ***see also*** Brief of Appellee, at 11 ("[T]he parties in the case at bar are in agreement that a crime did occur[.]"). The sole issue before this Court, therefore, is whether the evidence, "read in the light most favorable to the Commonwealth," shows "that the accused is probably the perpetrator of [the] crime." ***Ouch***, ***supra*** 923.

The Commonwealth argues the following evidence provides probable cause showing Perez killed Hazelton: (1) Perez and Hazelton engaged in two shoving matches before Hazelton received his fatal wound; (2) Perez moved his arm towards Hazelton's neck before Hazelton was stabbed; (3) Perez attempted to leave Bleu Martini after the stabbing; (4) Perez twice tried to discard his blood-stained shirt; and (5) Perez did not tell police he had Hazelton's blood on his shirt. ***See*** Brief of Appellant, at 17, 19–24.

From this evidence, the Commonwealth posits two key inferences from which it asks this Court to hold Perez for trial. ***Id.*** at 19–21. First, the Commonwealth asks us to infer the stabbing "could only have resulted from [Perez's] use of a deadly weapon" because of the temporal proximity between

Perez's arm movement and Hazelton receiving his neck wound. *Id.* at 19. Secondly, the Commonwealth claims Perez's "subsequent guilty behavior and efforts to conceal his role in the murder . . . supported the reasonable inference of his culpability." *Id.* at 20.

We find neither of the Commonwealth's proposed inferences supported by evidence of record. *See Prado*, *supra* at 10–11 (finding inference of defendant's identity as killer unavailable to Commonwealth in absence of evidence establishing defendant's actions at time of killing, motive to kill, or murder weapon used); *and compare Commonwealth v. Styler*, 600 A.2d 1300, 1302 (Pa. Super. 1991) (affording inference of intent to kill from statement indicating use of weapon was deliberate response to victim's conduct) *with Commonwealth v. Austin*, 575 A.2d 141, 145 (Pa. Super. 1990) (denying inference of intent to kill based on evidence of record stating killer swung knife at victim rather than deliberately plunging it into victim).

The Commonwealth's first inference, that only Perez was capable of stabbing Hazelton because of the proximity in time between the second shoving match and the stabbing, rests entirely on McNair's testimony.[8]  Brief

---

[8] The Commonwealth argues both Martinez and McNair testified to Perez engaging in "two separate physical altercations with the victim[.]"  Brief of Appellant, at 19.  We note Martinez' testimony indicates he did not see the first altercation or the stabbing. *See* N.T. First Preliminary Hearing, 3/22/17, at 9 (mentioning only second altercation); *see also id.* at 27 (Q. [Y]ou didn't see anyone get stabbed, did you?  A. No, I did not.  Q. You don't know if it was a male or female that inflicted the wound; do you?  A. Yes.  Q.  It could have been a female; right?  A.  Yes.").

of Appellant, at 19. McNair—who was directly monitoring Perez and Hazelton after the first shoving match—did not see Hazelton get stabbed. *See* N.T. Second Preliminary Hearing, 4/5/17, at 63 (Q. Okay. But you didn't see anything happen to the victim during this pushing match? A. I didn't see no stabbing, basically. Q. That's what I'm asking you. You didn't see none of that; right? A. No, I didn't see that."). McNair only realized Hazelton had been stabbed after an unknown woman shouted "they cut him" "a couple of seconds" after McNair separated the two. *Id.* at 78; *see also id.* at 66 ("Q. Okay when she said ['they cut him'], you did not see the Spanish guy [Perez], did you? A. No, I was facing the black guy [Hazelton], basically. Q. You don't know where the Spanish guy was, do you? A. At that moment, no, because I was right there facing the black guy.").

At some point during the second altercation, before McNair noticed Hazelton had been stabbed, he saw Perez make an "arm movement[9]" towards Hazelton's "neck area." *Id.* at 76. Enough time elapsed following the arm movement for McNair to separate Hazelton and Perez. *Id.* at 77. Moreover, McNair never saw anyone, including Perez, in possession of an item that could have been used as a weapon at any point, nor did he hear any breaking glass. *See id.* at 61–62. The police never recovered a weapon. *See*

---

[9] Nothing in the notes of testimony sheds clarity on the "arm movement" described by McNair. N.T. Second Preliminary Hearing, 4/5/17, at 76.

*id.* at 103. Finally, the record shows that the second, critical confrontation took place in the midst of between ten and thirty people facing off against one another.[10]   *See* N.T. 55 (Q.  How many people were in each group?  A.  . . . [I]t wasn't more than 15; and it wasn't less than five, like it was . . . two groups of people.").

Accepting McNair's testimony as true, we are nonetheless unable to find it more likely than not that Hazelton's wound resulted from Perez's use of a deadly weapon, as there are no facts—be it a weapon located at Bleu Martini or on Perez's person, clarifying testimony from the woman whose cries brought Hazelton's injury to McNair's attention, footage from Bleu Martini's video security system, or actions evincing a motive on Perez's part—to supplement McNair's description of a furtive arm movement, the results of which he did not see.  *Prado, supra* at 10–11; *Ouch*, *supra* at 923; *McBride*, *supra* at 591.

The Commonwealth's second inference, that Perez subsequently engaged in "guilty behavior and efforts to conceal his role in the murder [which] supported the reasonable inference of his culpability[,]" rests on an inapposite reading of the record.  *See* Brief of Appellant, at 20.  Specifically, the Commonwealth's analysis of the legal implications of flight following a

_____

[10] The Commonwealth argues there is "nothing in the record to suggest that there were '30 people' in the small lounge space where the victim was stabbed."  Brief of Appellant, at 22.  McNair's testimony belies that assertion. *See* N.T. Second Preliminary Hearing, 4/5/17, at 54–56.

crime and concealing evidence rests on the assumption that Perez fled or concealed evidence. **See id.** (citing **Commonwealth v. Rizzuto**, 777 A.2d 1069, 1078 (Pa. 2001) (fleeing scene of crime can demonstrate consciousness of guilt) and **Commonwealth v. Dollman**, 541 A.2d 319, 322 (Pa. 1988) (concealing evidence can prove accused's intent or state of mind)).

Though the Commonwealth asserts Perez fled and concealed evidence, the record shows he stayed at Bleu Martini's premises and cooperated with bar security and the police. Martinez saw Perez "coming outside [with] blood on his shirt." N.T. First Preliminary Hearing, 3/22/17, at 10. Martinez then "made an assumption" that Perez had stabbed Hazelton, and punched him in the face. **Id.** at 11. Perez then went back inside Bleu Martini. **Id.** McNair noticed Perez walking inside Bleu Martini because he was in violation of the dress code, not because of his behavior during or after the second pushing match. **See** N.T. Second Preliminary Hearing, 4/5/17, at 36–37 ("I seen the Spanish guy in a tank top basically and the rules to the club is like you must have a shirt on. So I was like, sir where's your shirt?"). Perez admitted the blood on his shirt came from "an incident" in the club and that the shirt was in the bathroom trashcan. **Id.** at 39. When McNair demanded Perez retrieve the shirt, he complied. **Id.** at 39–40.

When Officer Stone arrived, Perez was the lone patron left at Bleu Martini. **Id.** at 92. The security staff detained Perez because of the $600 he owed on his tab, not because they thought he was involved in stabbing

Hazelton. *See id.* at 92, 100 ("Q. [] So you go in, you see my client, and they tell you that he got a $600 tab; right? A. Yes. Q. That's why he was held there, wasn't it? A. Right."). When Officer Stone asked Perez where his shirt was, Perez again proved compliant, retrieving his bloody shirt from under the seat. *Id.* at 90–92. Officer Stone subsequently asked Perez how the blood got there, and Perez "just said he got hit" without admitting he was involved in a fight. *Id.* at 92.

Perez's actions contrast sharply with the factual circumstances surrounding the Commonwealth's proffered case law concerning flight, wherein defendants actually left the scene of the crime. *See* Brief of Appellant, at 20 (citing *Rizzuto*, *supra* at 1075–78, (finding flight evinced consciousness of guilt where defendant told his friend he was responsible for assaulting neighbor and was "on the run[.]")). Likewise, Perez's behavior is clearly distinguishable from the cases the Commonwealth presents to illustrate the legal implications of concealing evidence, which detail defendants destroying evidence of wrongdoing. *See id.* (citing *Commonwealth v. Truong*, 36 A.3d 592, 600 (Pa. Super. 2012) (en banc) (inferring consciousness of guilt from bucket of bloody rags defendant used to clean room where he killed his father) and *Commonwealth v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004) (inferring consciousness of guilt where defendant shot victim in van, left body in van, procured gasoline, and lit van on fire)). As Perez stayed at the scene of the crime, cooperated with club

staff, and complied with police, we are unable to find it reasonable to infer Perez's actions betrayed a consciousness of guilt. *See Ouch*, *supra* at 923.

We are likewise unable to infer a consciousness of guilt from Perez's words, which the Commonwealth asserts constitute a false denial to police. Brief of Appellant, at 21. The testimony in question, recounted by Officer Stone, reads as follows:

Q. What did you ask [Perez]?

A. **I asked him how did the blood get on there**[] and he said when he was fighting, you know, he got hit and that's how the blood got on there.

Q. Did [Perez] admit to you that he was fighting?

A. No, **he just said he got hit.**

N.T. Second Preliminary Hearing, 4/5/17, at 91–92 (emphasis added).

While DNA evidence later showed it to be Hazelton's blood on Perez's shirt, Perez offered an extremely limited answer to Officer Stone, which, in light of his otherwise cooperative behavior, can hardly be said to have "[misled] the police investigation and to obfuscate his participation in the crime." *See Commonwealth v. Calloway*, 459 A.2d 795, 799 (Pa. Super. 1983) (offering three statements to police denying involvement in robbery, in spite of co-conspirator testifying to defendant's role in robbery, constituted false denial). Perez's near non-answer fails to constitute a false denial under the Commonwealth's own proffered case law. *See* Brief of Appellant, at 21 (citing *Commonwealth v. Glass*, 405 A.2d 1236, 1242 (Pa. 1979) (denying

knowledge of victim's injury where defendant admitted to being at scene of crime moments before and moments after stabbing constituted false denial) and **Commonwealth v. Martin**, 640 A.2d 921, 926 (Pa. Super. 1994) (asserting spots on ceiling were juice, in light of history of abusing child, and DNA test revealing spots were child's blood, constituted false denial)). Perez's words, therefore, form an improper basis for inferring consciousness of guilt. **Ouch**, **supra** at 923

In sum, we find the law prohibits this Court from accepting the Commonwealth's inferences as reasonably drawn from the record. **See Ouch**, **supra** at 923 (requiring the court accept "inferences *reasonably* drawn from the record"); **see also McBride**, **supra** at 591 (finding evidentiary inferences "constitutionally infirm unless the inferred fact is more likely than not to flow from the proved fact on which it is made to depend."). We have reviewed the full record and accepted all facts in evidence without making an assessment as to weight or credibility; even read in the light most favorable to the Commonwealth, the evidence before us simply does not permit a finding that Perez "is **probably** the perpetrator of [the] crime." **Ouch**, **supra** 923. The record before us details a senseless quarrel and a tragic killing, but fails to furnish us with a sufficient quantum of evidence to link the two events at a *prima facie* level. **See id.**

Order affirmed.

President Judge Panella, President Judge Emeritus Gantman and Judge Murray join this Opinion.

Judge Nichols concurs in the result.

Judge Olson files a Concurring and Dissenting Opinion in which President Judge Emeritus Bender, Judge Kunselman and Judge McLaughlin join.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/7/19